RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0003p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

TERRY LEE STIMMEL,

*Plaintiff-Appellant,*

*v.*

No. 15-4196

JEFFERSON B. SESSIONS, III, Attorney General; FEDERAL BUREAU OF INVESTIGATION; BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; UNITED STATES OF AMERICA;

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:14-cv-02081—John R. Adams, District Judge.

Argued: August 2, 2017

Decided and Filed: January 4, 2018

Before: BOGGS, GRIFFIN, and WHITE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Derek A. DeBrosse, BARNEY DEBROSSE, LLC, Columbus, Ohio, for Appellant. Patrick G. Nemeroff, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Derek A. DeBrosse, BARNEY DEBROSSE, LLC, Columbus, Ohio, for Appellant. Patrick G. Nemeroff, Michael S. Raab, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. James R. McGuire, MORRISON & FOERSTER LLP, San Francisco, California, Julie Y. Park, MORRISON & FOERSTER LLP, San Diego, California, for Amicus Curiae.

GRIFFIN, J., delivered the opinion of the court in which WHITE, J., joined. BOGGS, J. (pp. 20–23), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.

Plaintiff Terry Lee Stimmel tried to purchase a firearm at a Walmart store in 2002. However, the store rejected Stimmel's offer because a mandatory national background check revealed that he had been convicted of misdemeanor domestic violence in 1997 and federal law prohibits domestic violence misdemeanants from possessing firearms. 18 U.S.C. § 922(g)(9). Thereafter, he unsuccessfully appealed to the Federal Bureau of Investigation ("FBI") and challenged the law in district court. Following the district court's dismissal of his complaint, Stimmel appeals.

The gravamen of Stimmel's appeal to this court is a question of first impression in our circuit: whether the firearm restriction, 18 U.S.C. § 922(g)(9), unconstitutionally burdens his Second Amendment rights. We hold that it does not.

In affirming the district court, we join the growing consensus of our sister circuits that have unanimously upheld the constitutionality of the domestic violence misdemeanant restriction to firearms possession. Here, the record contains sufficient evidence to reasonably conclude that disarming domestic violence misdemeanants is substantially related to the government's compelling interest of preventing gun violence and, particularly, domestic gun violence. Because Stimmel's conviction remains in effect, and he fails to rebut the government's evidence that domestic violence misdemeanants pose a significant risk of future armed violence, we conclude that § 922(g)(9) survives intermediate scrutiny.

I.

In 1997, Stimmel pleaded no contest to violating Ohio Revised Code § 2919.25(A), which prohibits "knowingly caus[ing] or attempt[ing] to cause physical harm to a family or household member," a misdemeanor crime of first-degree domestic violence. According to the arrest report, Stimmel "threw his wife up against a wall" during an argument and "knock[ed] her

to the floor." Stimmel then "tried to remove her wedding rings," and she "received a cut to her head." He was sentenced to 180 days in jail, with all but one day suspended on condition of Stimmel's good behavior for two years, and a $100 fine. He was also ordered to stay away from the victim, to whom he is no longer married. Stimmel has not been convicted of another crime since.

In 2002, Stimmel tried to buy a firearm to "defend[] his home and his family." When he failed the required national background check, he appealed to the FBI. The FBI denied his appeal because, as a domestic violence misdemeanant, he is subject to a firearm restriction under 18 U.S.C. § 922(g)(9). Thereafter, Stimmel challenged the statute in district court. He asserted five claims there, but on appeal argues only that: (1) § 922(g)(9) unconstitutionally burdens his Second Amendment rights; and (2) Congress's creation of a relief program available to certain disarmed individuals, but not Stimmel, violates his Fifth Amendment right to equal protection under the law.

The district court dismissed Stimmel's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), concluding his Second Amendment challenge to § 922(g)(9) "fail[s] as a matter of law" and his equal protection challenge fails because he is not similarly situated to persons barred from owning firearms under § 922(g)(4). *Stimmel v. Lynch*, No. 5:14CV2081, 2015 WL 5730104, at *7–8 (N.D. Ohio Sept. 28, 2015). The district court held that the domestic violence misdemeanant restriction does not "implicate the Second Amendment" because it "falls squarely within the authority to disarm serious lawbreakers in existence well before the enactment of the Second Amendment." *Id.* at *5. In the alternative, the district court applied strict scrutiny and ruled that § 922(g)(9) was narrowly tailored to achieve the government's compelling interest of preventing domestic gun violence. *Id.* at *6–7. The district court rejected Stimmel's argument that he has abided by the law ever since his conviction, cautioning that he was not to be "afforded rights simply by virtue of being conviction-free for numerous years." *Id.* at *7.

The district court also determined that Stimmel, having committed the "volitional act of domestic violence," could not pursue his equal protection claim because he was not similarly

situated to those prohibited from possessing weapons after being adjudicated mentally ill or committed to a mental institution. *Id.* at *8.

Stimmel timely appeals.

## II.

We review de novo the district court's grant of defendants' motion to dismiss Stimmel's complaint for failure to state a claim. *Linkletter v. W. & S. Fin. Grp., Inc.*, 851 F.3d 632, 637 (6th Cir. 2017). In doing so, we accept Stimmel's well-plead factual allegations as true and construe the complaint in the light most favorable to him. *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005).

## III.

The Gun Control Act of 1968 bars firearm possession by certain groups of individuals, including convicted felons, and those "adjudicated as a mental defective or who ha[ve] been committed to a mental institution." *See* 18 U.S.C. § 922(g)(1), (4). In 1996, Congress added the domestic violence misdemeanant restriction, § 922(g)(9). Pub. L. No. 104–208, Tit. VI, § 658, 110 Stat. 3009–371 to 3009–372 (1996). Recognizing that "[e]xisting felon-in-possession laws . . . were not keeping firearms out of the hands of domestic abusers, because many people who engage in serious spousal or child abuse ultimately are not charged with or convicted of felonies," Congress extended "the federal firearm prohibition to persons convicted of misdemeanor crimes of domestic violence" to "close this dangerous loophole." *United States v. Hayes*, 555 U.S. 415, 426 (2009) (internal quotation marks, citation, and bracket omitted).

Specifically, the statute provides that:

> It shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

*See* § 922(g)–(g)(9). To qualify as a "misdemeanor crime of domestic violence" for purposes of § 922(g)(9), the predicate offense must have as an element the "use or attempted use of physical

force, or the threatened use of a deadly weapon" by a person who has a specified relationship with the victim. *See* 18 U.S.C. § 921(a)(33)(A)(ii). Stimmel, then his victim's spouse, pleaded no contest to "knowingly caus[ing] or attempt[ing] to cause physical harm to a family or household member" in violation of Ohio Revised Code § 2919.25(A), and thus falls squarely within § 922(g)(9)'s scope.

### IV.

On appeal, Stimmel argues the domestic violence misdemeanant restriction violates his Second Amendment rights. The Second Amendment provides that "[a] well[-]regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Amendment guarantees "an individual right to keep and bear arms" without regard to militia service. *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008).

Every circuit that has considered a post-*Heller* Second Amendment challenge to § 922(g)(9) has upheld the statute, albeit under varying frameworks and rationales. *See United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013); *United States v. Staten*, 666 F.3d 154, 160–61 (4th Cir. 2011); *United States v. Booker*, 644 F.3d 12, 22–26 (1st Cir. 2011); *United States v. Skoien*, 614 F.3d 638, 639–45 (7th Cir. 2010) (en banc); *United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010); *cf. Fisher v. Kealoha*, 855 F.3d 1067, 1070 (9th Cir. 2017) (per curiam); *United States v. Chester*, 514 F. App'x 393, 394–95 (4th Cir. 2013) (per curiam); *In re United States*, 578 F.3d 1195, 1200 (10th Cir. 2009) (mem) (nonprecedential order attached to published dissent).

### A.

As a threshold matter, *District of Columbia v. Heller* theoretically could resolve the constitutional question Stimmel poses here. *See Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 686–88 (6th Cir. 2016) (en banc). The Second Amendment's core right allows "law-abiding, responsible citizens to use arms in defense of hearth and home." *Heller*, 554 U.S. at 635. But this fundamental right is "not unlimited." *Id.* at 626. By acknowledging that "law-abiding, responsible citizens" are at the core of the Amendment's protections, the *Heller* Court

presumed certain individuals can be "disqualified" from exercising Second Amendment rights. *See id.* at 635.

> To that end, the Court cautioned that:
>
> [N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626–27. The Court "identif[ied] these presumptively lawful regulatory measures only as examples; [its] list does not purport to be exhaustive." *Id*. at 627 n.26.

Relying on *Heller*, our court has rejected Second Amendment challenges to § 922(g)(1), the felons-in-possession restriction. *See, e.g.*, *United States v. Carey*, 602 F.3d 738, 741 (6th Cir. 2010). Moreover, the Court of Appeals for the Eleventh Circuit has held that *Heller*'s presumptively lawful prohibitions include § 922(g)(9). *White*, 593 F.3d at 1205–06. Other circuits have suggested, but not held, as much. *See Booker*, 644 F.3d at 24–25; *cf. In re United States*, 578 F.3d at 1200. However, because § 922(g)(9) survives intermediate scrutiny under our *Greeno* two-step test, it is not necessary for us to decide the issue.[1]

## B.

In analyzing Second Amendment challenges, our court conducts the two-step inquiry established in *United States v. Greeno*.[2] 679 F.3d 510, 518 (6th Cir. 2012). First, the government must show "that the challenged statute regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment—1791 [Bill of Rights ratification] or 1868 [Fourteenth Amendment ratification]." *Id.* (internal quotation

---

[1]Writing not for this court, I would follow the precedent of the Eleventh Circuit and affirm the district court's judgment under the terms of *Heller*. As our colleague Judge Siler, sitting by designation on the Eleventh Circuit, reasoned in *United States v. White*, § 922(g)(9) "warrants inclusion on *Heller*'s list of presumptively lawful longstanding prohibitions" because it was enacted specifically to close a dangerous loophole in the felons-in-possession ban. 593 F.3d at 1205; *see also Booker*, 644 F.3d at 24 (the misdemeanant restriction "is, historically and practically, a corollary outgrowth of the federal felon disqualification statute").

[2]Stimmel questions whether this court should still apply its *Greeno* framework in Second Amendment cases. However, *Greeno* is the law of this circuit. *See Tyler*, 837 F.3d at 685–86.

marks and citation omitted). If the government satisfies its initial burden, "then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." *Id.* (citation omitted).

If the government offers "historical evidence [that] is inconclusive or suggests that the regulated activity is *not* categorically unprotected," however, then we must inquire "into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights." *Id.* (citation omitted). Under this second prong, we determine and apply the appropriate level of heightened means-end scrutiny, given that the Supreme Court has rejected rational-basis review in this context. *Id.*; *see Heller*, 554 U.S. at 628 n.27.

1.

At *Greeno*'s first step, we consider "the scope of the Second Amendment right[] as historically understood." 679 F.3d at 518. Because § 922(g)(9) regulates a class of individuals, the government must "conclusively demonstrate that the challenged statute burdens persons historically understood to be unprotected" by the Amendment. *Tyler*, 837 F.3d at 688. The government has found no success on this question in other circuits. *See Chovan*, 735 F.3d at 1137; *Staten*, 666 F.3d at 160–61; *Skoien*, 614 F.3d at 640–42. And here it again proffers inconclusive evidence on the question of whether there was a historically understood limitation with respect to domestic violence misdemeanants.

The government, and the amicus curiae Law Center to Prevent Gun Violence ("Law Center"), argue § 922(g)(9) is a longstanding prohibition rooted in the historical tradition that only peaceable or virtuous citizens could keep and bear arms. In support, the government cites Samuel Adams's proposal at the Massachusetts ratifying convention "that the said Constitution be never construed to authorize Congress . . . to prevent the people of the United States, who are peaceable citizens, from keeping their own arms . . . ." Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788 (1856), *reprinted in* 2 Bernard Schwartz, The Bill of Rights, A Documentary History 676, 681 (1971). But Adams only underscored what *Heller* conclusively established: the Second Amendment applies to law-abiding and peaceable citizens at the very least. *See Heller*, 554 U.S. at 635.

The government maintains that because domestic violence misdemeanants are neither, they fall outside the Second Amendment's scope of protection altogether. To that end, the government relies on the often-cited Pennsylvania anti-federalist faction draft of the Second Amendment that would have guaranteed "the people have a right to bear arms for the defense of themselves and their own State or the United States" and provided that "no law shall be passed for disarming the people or any of them unless for crimes committed, or real danger of public injury from individuals . . . ." The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787, *reprinted in* 2 Schwartz, *The Bill of Rights*, 662, 665.

Domestic violence misdemeanants may be at least somewhat removed from the Second Amendment's core right by virtue of their "crimes committed," but the Amendment's core does not necessarily demarcate its outer limit. While the *Heller* Court identified the Pennsylvania Convention proposal as a "highly influential" precursor to the Second Amendment, it did so only in the context of concluding that the Amendment codified an individual right not limited to militia service. *See* 554 U.S. at 603–04. The Court offered no comment on, nor analysis of, the proposal's "unless for crimes committed" clause. *See id.* And, to be sure, the final text of the Second Amendment did not incorporate this proposed language.

The government specifies no source establishing that individuals who physically abused their family members or intimate partners were historically restricted from bearing arms. That the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635, does not itself establish that domestic violence misdemeanants were excluded from the Amendment's scope as historically understood. *Cf. Tyler*, 837 F.3d at 708 (Sutton, J., concurring) ("*Heller* does not stand for the proposition that anyone ever convicted of a felony falls outside the Second Amendment's protections.").

The next question is whether § 922(g)(9), enacted in 1996, is a longstanding prohibition. On this issue, the government acknowledges the statute may not have "a precise founding-era analogue," but argues the *Heller* Court considered other Twentieth-Century prohibitions "longstanding," including the similar felons-in-possession ban. *Heller* does not instruct that

"presumptively lawful" exclusions must mirror restrictions on firearm possession in effect as of 1791. *See Skoien*, 614 F.3d at 641. However, *Heller*'s conclusion that some Twentieth-Century prohibitions are longstanding does not necessarily establish that the 1996 statute at issue should be considered longstanding as well.

All told, the government has not demonstrated that the Second Amendment, as historically understood, excludes individuals who had abused family members or intimate partners. Given the inconclusive nature of the government's evidence, and our ultimate conclusion that Stimmel's claim fails at *Greeno*'s second step, we follow the lead of several of our sister circuits in assuming, without deciding, that a domestic violence misdemeanant's Second Amendment rights remain intact to some degree and continue to the next step of our inquiry.[3] *See, e.g.*, *Chovan*, 735 F.3d at 1137; *Staten*, 666 F.3d at 160–61.

2.

At the determinative second step, we must first decide the level of scrutiny to apply. *Greeno*, 679 F.3d at 518. In doing so, we analyze "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights" under the applicable scrutiny standard. *Id.* (citation omitted).

We hold that intermediate scrutiny is warranted for our review of § 922(g)(9). Stimmel urges us to apply strict scrutiny, but his position runs counter to the clear preference of most appellate courts for applying intermediate scrutiny to § 922(g) challenges. *See Tyler*, 837 F.3d at 692–93 (collecting cases). Furthermore, in *Tyler v. Hillsdale County Sheriff's Department*,[4] our court, sitting en banc, acknowledged that the "risk inherent in firearms" distinguishes the right to keep and bear arms "from other fundamental rights that have been held to be evaluated under a

---

[3]Stimmel repeatedly faults the district court for failing to engage in a robust historical inquiry at step one of its *Greeno* analysis. However, we review the *judgment* of the district court and therefore decline his request to remand this case "in quest of a perfect opinion." *Cf. Shkabari v. Gonzalez*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).

[4]In that case, we examined the constitutionality of § 922(g)(4), which prohibits those adjudicated mentally ill and those involuntarily committed to a mental institution from owning firearms. A majority of the en banc court reversed the district court's dismissal of Tyler's complaint and remanded "to the district court for the application of intermediate scrutiny to determine the statute's constitutionality as applied to Tyler." *Tyler*, 837 F.3d at 699.

strict scrutiny test." 837 F.3d at 691 (quoting *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015)). In addition, we stated that "[i]ntermediate scrutiny is preferable in evaluating challenges to § 922(g)(4) and similar provisions," *see id.* at 692, such as § 922(g)(9), which "ha[s] been consistently reviewed under intermediate scrutiny."[5] *Id.* at 691–92 (collecting cases); *see also Fisher*, 855 F.3d at 1070–71. As the *Tyler* lead and dissenting opinions explained, applying intermediate scrutiny in this context strikes an appropriate balance between affording Congress considerable flexibility in regulating gun safety while still requiring the government to justify its firearms restrictions. 837 F.3d at 692; *id.* at 717 (Moore, J., dissenting).

Here, in choosing to apply intermediate scrutiny, we are "informed by (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Id.* at 690 (lead opinion) (internal quotation marks and citation omitted). Regarding the first question, Stimmel, as a domestic violence misdemeanant, is at least somewhat removed from the Amendment's core protected class as defined in *Heller*.[6] There is no doubt Stimmel's conviction remains in effect. To hold that he falls squarely within the Amendment's core right, despite his existing criminal conviction for volitional, violent conduct, "would cut too hard against Congress's power to categorically prohibit certain presumptively dangerous people from gun ownership." *Id.* at 691.

Regarding the second question, § 922(g)(9) is a significant restriction, but Congress lightened the burden on the right by providing domestic violence misdemeanants with four mechanisms of relief from their firearm disability. They can (1) petition to set aside their conviction; (2) seek a pardon; (3) have their conviction expunged; or (4) have their civil rights

---

[5]Some judges (including the district court judge in this case) would uphold the statute under strict scrutiny. *See, e.g.*, *Chovan*, 735 F.3d at 1149–52 (Bea, J., concurring); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231–35 (D. Utah 2009). Stimmel cites no decisions declaring § 922(g)(9) unconstitutional under either strict or intermediate scrutiny.

[6]Stimmel's protestations that the law impacts a broad swath of individuals guilty of reckless conduct do not establish that § 922(g)(9) burdens the public at large more than "a narrow[er] class of individuals" within the general public "who are not at the core of the Second Amendment." *See Tyler*, 837 F.3d at 691. Furthermore, this argument does not apply to Stimmel, who was convicted of "*knowingly* caus[ing] or attempt[ing] to cause physical harm to a family or household member." Ohio Rev. Code § 2919.25(A) (emphasis added); *cf.* § 2919.25(B) (prohibiting recklessly causing serious harm to family members). "A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present." *Skoien*, 614 F.3d at 645 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

fully restored.**7**   *See* § 921(a)(33)(B)(ii).   Although availability of these avenues of relief may vary among states, "this is true of all situations in which a firearms disability (or any other adverse consequence) depends on state law."   *Skoien*, 614 F.3d at 645.   Anomalous results under the statute are tolerable where Congress "sought to defer to a State's dispensation relieving an offender from disabling effects of a conviction."   *Logan v. United States*, 552 U.S. 23, 37 (2007). As "[t]he plain language of these statutory provisions makes clear," "section 921(a)(33)(B)(ii) creates exceptions to section 922(g)(9)'s general prohibition, rather than preconditions to its application."   *Fisher*, 855 F.3d at 1070.

In sum, § 922(g)(9) places a substantial burden on the right, but does not touch the Second Amendment's core—intermediate scrutiny is appropriate here.   *See Tyler*, 837 F.3d at 692.

3.

The burden of justifying § 922(g)(9) under heightened scrutiny is demanding and remains with the government.   Under intermediate scrutiny, the government must state a "significant, substantial, or important" objective and establish "a reasonable fit" between the challenged restriction and that objective.   *Id.* at 693.   Stimmel concedes "§ 922(g)(9) furthers a compelling interest of reducing domestic gun violence."   "It is self-evident that the government interest of preventing domestic gun violence is important."   *Chovan*, 735 F.3d at 1139; *see also Booker*, 644 F.3d at 25.   And the statute's overarching objective is equally so.   *See Tyler*, 837 F.3d at 693; *see also United States v. Yancey*, 621 F.3d 681, 683–84 (7th Cir. 2010) ("The broad objective of § 922(g)—suppressing armed violence—is without doubt an important one." (citations omitted)).

The critical question, then, is whether the government has established a "reasonable fit" between its compelling objective of preventing gun violence, and domestic gun violence specifically, and disarming misdemeanants convicted of domestic abuse.   *See Tyler*, 837 F.3d at

---

**7**Stimmel has not pursued these options, but maintains they are not "realistic" or "viable."   Neither civil rights restoration nor expungement is available to him under Ohio law.   *See* Ohio Rev. Code §§ 2953.37, 2953.38, 2151.358, 2961.01, 2967.16.   However, other options remain open, such as setting aside his conviction under Ohio Rule of Criminal Procedure 32.1, or seeking a pardon.

693. Because this "reasonable fit" does not need to be a *perfect* one, the government "need not prove that there is no burden whatsoever" on Stimmel's Second Amendment right. *Id.* (internal quotation marks and citation omitted). A regulation is reasonable if it "represents not necessarily the single best disposition but one whose scope is in proportion to the interest served." *Id.* (citation omitted). The government may "rely on a wide range of sources, including legislative history, empirical evidence, case law, and even common sense" in discharging its burden. *Id.* at 694.

According to Stimmel, the fit cannot be reasonable where a lone domestic violence misdemeanor conviction is sufficient justification for disarming him, for all practical purposes, for life. We disagree. Congress enacted the restriction to disarm people who had engaged in fundamentally felonious conduct, but were convicted of misdemeanors and thus fell outside § 922(g)(1)'s reach. *See Hayes*, 555 U.S. at 426. Domestic violence remains a serious, pervasive problem; the Supreme Court observed in 2014 that the United States "witnesses more than a million acts of domestic violence, and hundreds of deaths from domestic violence, each year." *United States v. Castleman*, 134 S. Ct. 1405, 1408 (2014). In addition, a 2010 nationally representative study shows "1 in 4 women (24.3%) and 1 in 7 men (13.8%)" reported experiencing "severe physical violence by an intimate partner" during their lifetime. Michele C. Black, et al., Ctrs. for Disease Control and Prevention, Nat'l Ctr. for Injury Prevention and Control, *The National Intimate Partner and Sexual Violence Survey: 2010 Summary Report* 2 (2011).

The government further maintains that domestic violence misdemeanants are significantly likely to commit future acts of violence, implying there are considerable benefits in keeping deadly weapons out of their hands. In support, it cites a study of 3,662 individuals arrested in Cincinnati, Ohio, for misdemeanor domestic violence that documents how 17% of those who remained in the jurisdiction for the duration of the study's three-year period were re-arrested for the same crime. John Wooldredge & Amy Thistlethwaite, *Reconsidering Domestic Violence Recidivism: Individual and Contextual Effects of Court Dispositions and Stake in Conformity* ii, iv (1999). This particular study, however, does not account "for the many repeat

domestic violence acts that are never reported to the police." *Staten*, 666 F.3d at 164 (discussing report).

To fill that gap in data, the government proffers a 2005 survey of then-available research that gives an overall estimated recidivism rate range of between 40% and 80% "when victims are followed longitudinally and interviewed directly." Carla Smith Stover, *Domestic Violence Research: What Have We Learned and Where Do We Go From Here?*, 20 J. Interpersonal Violence 448, 450 (2005). It also cites a 2004 "meta-analytic review" of twenty-two studies that estimates an overall recidivism rate of 35% for non-treated offenders when based on partners' reports, and an overall rate of 21% when based solely on police reports. Julia C. Babcock, et al., *Does Batterers' Treatment Work? A Meta–Analytic Review of Domestic Violence Treatment*, 23 Clinical Psychol. Rev. 1023, 1039 (2004). Moreover, the Law Center references a study documenting that, even after twenty years, violent criminals present a slightly higher risk of arrest than those without criminal records. *See* Alfred Blumstein & Kiminori Nakamura, *Redemption in the Presence of Widespread Criminal Background Checks*, 47 Criminology 327, 341–43, fig.4 (2009) ("aside from random fluctuations, [the risk of re-arrest for a subject with a criminal record] comes very close to [the risk of arrest for the never arrested] but remains above it, even [after 20 years].").

Stimmel challenges as outdated the recidivism rate range of between 40% and 80% the government relies on here because, "since the early 1990s, mandatory arrest laws for domestic violence complaints have become commonplace." Yet, he does not explain how these laws have materially affected the recidivism rate in the studies the government specifies. He also objects to the low-end 40% figure, maintaining that the source of that figure, a study by Melanie Shepard, actually "places the [rate] of recidivism at 22%." But in the Shepard study, the 22% figure refers specifically to the rate of repeat convictions among those identified as recidivists, not the *overall* 40% recidivism rate. *See* Melanie Shepard, *Predicting Batterer Recidivism Five Years After Community Intervention*, 7 J. of Fam. Violence 167, 173–74 (1992). The 40% overall rate, which likely "underestimates the extent of continued abusive behavior," *id.* at 174, includes those under a protective order for domestic assault and those police suspect of domestic assault. *Id.* at 172. In other words, a "recidivist" as defined in these studies is not limited to those who

are convicted again. *See id.*; *see also* Babcock, *Does Batterers' Treatment Work*, 1036 ("recidivism" is "any report of physical violence reported by the victims" or "any domestic violence incidents reported to the police during a follow-up period"). Even if we considered a recidivism rate of only 22% as Stimmel argues, Congress would still be justified in disarming individuals presenting a one-in-five chance of repeated domestic violence—indeed, the Supreme Court has "recognized and given weight" to Congress's "broad prophylactic purpose" in enacting the § 922(g) provisions. *Dickerson v. New Banner Inst.*, 460 U.S. 103, 118 (1983), superseded by statute, *see* Firearms Owners' Protection Act of 1986, 18 U.S.C. § 921(a)(20).

"No matter how you slice these numbers, people convicted of domestic violence remain dangerous to their spouses and partners." *Skoien*, 614 F.3d at 644. Essential here is that the victim is more likely to be killed when a gun is present. As the Supreme Court has stated, "[d]omestic violence often escalates in severity over time, and the presence of a firearm increases the likelihood that it will escalate to homicide." *Castleman*, 134 S. Ct. at 1408 (citations omitted). Moreover, "nearly 52,000 individuals were murdered by a domestic intimate between 1976 and 1996, and the perpetrator used a firearm in roughly 65% of the murders (33,500)." *Booker*, 644 F.3d at 25–26.

The government has identified additional relevant data points. First, it cites a medical study concluding that incidents of domestic violence involving a firearm are twelve times more likely to end in the victim's death than incidents involving a knife or an unarmed abuser. Linda E. Saltzman, et al., *Weapon Involvement and Injury Outcomes in Family and Intimate Assaults*, 267 JAMA 3043, 3044 (1992). A second study concludes that the presence of a gun in the residence of a domestic abuser is "strongly and independently associated with homicide." Arthur L. Kellermann, et al., *Gun Ownership as a Risk Factor for Homicide in the Home*, 329 New Eng. J. Med. 1084, 1087 (1993). Stimmel argues this quote "has nothing to do with gun ownership of the individual convicted of domestic violence." Although the Kellerman study does not limit its findings to those who have been *convicted* of domestic violence, it supports the government's position. For example, the study found that "[p]revious family violence was linked to an increased risk of homicide" and "[v]irtually all of this increased risk was due to a marked association between prior domestic violence and homicide at the hands of a family

member or intimate acquaintance[.]" *Id.* at 1087. It further warns that "battering tends to increase in frequency and severity over time" without "effective intervention," and concludes that "assaults by family members or other intimate acquaintances with a gun are far more likely to end in death than those that involve knives or other weapons." *Id.* at 1090.

This risk of death extends beyond those in an intimate or familial relationship with the abuser. As the Law Center notes, responding to family violence calls is among a police officer's most risky duties. Nick Breul & Mike Keith, *Deadly Calls and Fatal Encounters: Analysis of U.S. Law Enforcement Line of Duty Deaths When Officers Responded to Dispatched Calls for Service and Conducted Enforcement, 2010-2014*, 15 (2016). Preliminary FBI statistical data for 2016 indicates that approximately 10% of non-accidental law enforcement officer fatalities in the line of duty that year occurred while the officers were responding to domestic disturbance calls. *See* Press Release, FBI Nat'l Press Office, FBI Releases 2016 Preliminary Statistics for Law Enforcement Officers Killed in the Line of Duty (May 15, 2017), https://www.fbi.gov/news/pressrel/press-releases/fbi-releases-2016-preliminary-statistics-for-law-enforcement-officers-killed-in-the-line-of-duty.

At least four other circuits have relied on much of the same evidence in ruling that the statute is constitutional. *See, e.g.*, *Chovan*, 735 F.3d at 1140–41; *Staten*, 666 F.3d at 164–65; *Booker*, 644 F.3d at 25–26; *Skoien*, 614 F.3d at 643–44. Stimmel has not adduced any evidence to directly contradict it, nor offered sufficient reason to discount its validity. Instead, Stimmel underscores that he has lived a law-abiding life without any additional convictions since 1997. But this passage-of-time argument has been soundly rejected by at least one other circuit. *Chovan*, 735 F.3d at 1141–42 (rejecting argument that § 922(g)(9) cannot constitutionally apply to plaintiff after fifteen years without a domestic violence conviction); *see also Fisher*, 855 F.3d at 1071 (twenty-year-old harassment conviction does not render § 922(g)(9) unconstitutional as applied to plaintiff). It is equally unpersuasive here. Stimmel fails to cite any statistical data supporting his argument "that if a domestic abuser has not committed domestic violence for [twenty] years, that abuser is highly unlikely to do so again." *Chovan*, 735 F.3d at 1142. Even if Stimmel presents no such risk, "some categorical disqualifications are permissible [because] Congress is not limited to case-by-case exclusions of persons who have been shown to be

untrustworthy with weapons, nor need these limits be established by evidence presented in court." *Skoien*, 614 F.3d at 641; *see also Booker*, 644 F.3d at 23 (Second Amendment does not require "that restrictions on the right be imposed only on an individualized, case-by-case basis").

To the extent Stimmel argues for a chance to demonstrate in court that he no longer poses a risk of future violence, we have declined to "read *Heller* to require an individualized hearing to determine whether the government has made an improper categorization" and questioned "the institutional capacity of the courts to engage in such determinations." *Tyler*, 837 F.3d at 698 n.18. Our statement echoes the Supreme Court's doubt that courts have the capacity to determine whether an individual is "likely to act in a manner dangerous to public safety" because "an inquiry into [an individual's] background [is] a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." *United States v. Bean*, 537 U.S. 71, 77 (2002) (holding federal courts lack jurisdiction to review a relief-from-firearms-disability application under 18 U.S.C. § 925(c) that the designated agency does not review due to lack of funding).

As the Ninth Circuit observed, if Congress had wanted to limit the statute's application to recent domestic violence convictions, it could have created a limited durational ban for these misdemeanants, or a good behavior clause that would automatically relieve them of their firearms disability after a specified number of years without a new domestic violence arrest, charge, or conviction. *See Chovan*, 735 F.3d at 1142. But Congress chose not to do so. Instead, it excepted those with expunged, pardoned, or set aside convictions, or those who have had their civil rights restored. To sanction Stimmel's as-applied challenge would thus create an exception to § 922(g)(9) that Congress did not establish and would "undermine Congress's judgment that risk or potential, not likelihood, probability, or certainty, of violence is" sufficient. *United States v. Chamberlain*, 159 F.3d 656, 664 (1st Cir. 1998), *abrogated on other grounds as recognized in United States v. Rehlander*, 666 F.3d 45 (1st Cir. 2012).

"[I]n the context of gun safety, the expense and other difficulties of individual determinations may necessitate the inherent imprecision of a prophylactic rule." *Tyler*, 837 F.3d at 698 (internal quotation marks and citation omitted). Indeed, we have upheld § 922(g)(1), which disarms even non-violent felons. *See Carey*, 602 F.3d at 741. At bottom, § 922(g)(9) is

arguably "somewhat over-inclusive given that every domestic violence misdemeanant would not necessarily misuse a firearm against a spouse, former spouse, or other person with whom such person had a domestic relationship specified in § 921(a)(33)(A), if permitted to possess one." *Staten*, 666 F.3d at 167. But "this observation merely suggests that the fit is not perfect," and thus does not undermine the statute's constitutionality because a *reasonable* fit is all that intermediate scrutiny requires. *Id.*; *see also United States v. Chapman*, 666 F.3d 220, 231 (4th Cir. 2012) (same).

On the government's evidence, which Stimmel fails to rebut, it is reasonable to conclude that domestic abusers have high recidivism rates, pose a continued risk to their families, as well as law enforcement, are more likely to kill their victims when armed, and should therefore be disarmed. In accord with the unanimous view of those circuits that have addressed the question, we conclude the fit here is, at least, reasonable. Section § 922(g)(9) survives intermediate scrutiny.

V.

Finally, the district court did not err by dismissing Stimmel's equal protection claim. Although 18 U.S.C. § 925(c) permits the Attorney General to grant relief from a firearms disability if "the applicant will not be likely to act in a manner dangerous to public safety and . . . the granting of the relief would not be contrary to the public interest," Congress has withheld funding for processing § 925(c) relief applications since 1992 after finding that reviewing applications was a "very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision [wa]s made." *Tyler*, 837 F.3d at 682 (quoting S. Rep. No. 102–353, at 19 (1992)).

While § 925(c) is currently a nullity in practice, Congress has created alternative avenues for relief from a firearms disability. First, as discussed, domestic violence misdemeanants may seek: (1) to set aside their convictions; (2) a pardon; (3) to have their convictions expunged; or (4) to have their civil rights fully restored. *See* § 921(a)(33)(B)(ii). In addition, Congress more recently established a different path to relief for those individuals disarmed under § 922(g)(4). In the wake of the 2007 Virginia Tech massacre, Congress enacted the NICS Improvement

Amendments Act of 2007 authorizing federal grants to help states improve the quality of the mental health information they make available to the databases searched by the national instant criminal background check system ("NICS") when an individual tries to purchase a firearm. Pub. L. No. 110–180, § 103(a)(1), 121 Stat. 2567 (2008). To be eligible for a grant, a state must certify that it has implemented a program allowing those disqualified from possessing a firearm under § 922(g)(4) to apply to the state for relief from that firearm disability. *Id.* § 103(c), 121 Stat. 2568; *id.* § 105(a), 121 Stat. 2569.

Stimmel argues that limiting the NICS relief program to those disarmed under § 922(g)(4) violates his right to equal protection. We evaluate equal protection claims against the federal government under the Fifth Amendment just as we would evaluate equal protection claims against state and local governments under the Fourteenth Amendment. *See United States v. Angel*, 355 F.3d 462, 471 (6th Cir. 2004) (citing *Buckley v. Valeo*, 424 U.S. 1, 93 (1976)). "To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotation marks and citation omitted). "In determining whether individuals are similarly situated, a court should not demand exact correlation, but should instead seek relevant similarity." *Bench Billboard Co. v. City of Cincinnati*, 675 F.3d 974, 987 (6th Cir. 2012) (internal quotation marks and citation omitted).

Other than the fact that he is also prohibited from possessing firearms under federal law, Stimmel does not articulate how he is similarly situated to a person disarmed under § 922(g)(4). While domestic violence misdemeanants have been adjudicated guilty under state law of voluntary criminal conduct, § 922(g)(4) disarms those "adjudicated as a mental defective," an involuntary and possibly temporary and treatable medical condition, or who have been involuntarily committed to a mental health facility. These relevant distinctions are reflected in Congress's decision to improve the provision of mental health and commitment records to the NICS while providing some form of relief to those "who have overcome a disqualifying mental illness or disability." 153 Cong. Rec. S15970-02 (Dec. 19, 2007) (statement of Sen. Leahy).

As Stimmel has failed to establish that he is similarly situated to those subject to § 922(g)(4), his equal protection claim fails.

VI.

In conclusion, all of our sister circuits that have considered Second Amendment challenges to § 922(g)(9) have unanimously upheld the restriction as constitutional. For the reasons stated above, we join them and affirm the district court's judgment.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

BOGGS, Circuit Judge, dissenting.  Domestic violence has been, and continues to be, a serious problem in this country.  The question before this court, however, is not whether the government has a compelling interest in curbing the incidence of domestic firearm violence.  We all agree that it does.  Nor is it whether the government can, under certain conditions, limit the federal firearm rights of some domestic violence misdemeanants.  We all agree that it can.  Rather, the question is whether the government has satisfied its burden of showing that the restriction imposed by 18 U.S.C. § 922(g)(9) appropriately fits its stated objective.  Because the government has offered, at best, minimal evidence that a non-recidivist domestic violence misdemeanant presents a heightened risk of reoffending decades after his or her conviction, it has yet to justify what is, effectively, a lifetime ban on a fundamental constitutional right.  I therefore respectfully dissent.

I

As the majority notes, we apply the two-step test from *United States v. Greeno*, 679 F.3d 510 (6th Cir. 2012), when considering Second Amendment challenges.  *Tyler v. Hillsdale Cty. Sheriff's Dep't*, 837 F.3d 678, 685 (6th Cir. 2016) (en banc).  At the first step, we ask "whether the challenged law burdens conduct that falls within the scope of the Second Amendment right, as historically understood."  *Greeno*, 679 F.3d at 518.  Because I agree with my colleagues that "the government has not demonstrated that the Second Amendment, as historically understood, excludes individuals who had abused family members or intimate partners," Majority Op. at 9, and because the government bears the evidentiary burden, we proceed to the second stage of the analysis, *Greeno*, 679 F.3d at 518.  There, we scrutinize "the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights," applying the appropriate level of scrutiny.  *Ibid.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011)).

While I have expressed my view that strict scrutiny should apply to Second Amendment restrictions, *see, e.g.*, *Tyler*, 837 F.3d at 702 (Boggs, J., concurring in most of the judgment) ("The proper level of scrutiny is strict scrutiny, as with other fundamental constitutional rights . . . ."), I will accept, *arguendo*, my colleagues' contention that intermediate scrutiny is warranted in this case. Given this assumption, the majority is correct that the critical question here is "whether the government has established a 'reasonable fit' between its compelling objective of preventing gun violence, and domestic gun violence specifically, and disarming misdemeanants convicted of domestic abuse." Majority Op. at 11.

Where the majority errs is in failing to recognize that the question of fit has a temporal component. In *Tyler*, we held that when a firearm-ownership ban is "effectively permanent," "some evidence of the *continuing* need to disarm . . . is necessary to justify [the ban's] means to its ends." 837 F.3d at 694 (emphasis added). This requirement rests on the fact that the reasonableness of fit depends, in part, on the relative size of the set of "true positives" to that of "false positives." The first contains all people to whom the firearm ban applies and whose disarmament furthers the government's compelling objective, while the second contains those who are prevented from obtaining a firearm but who would not misuse one. Where the latter group is large relative to the former, the fit is poor—not just imperfect—and is, therefore, likely to be unreasonable. The length of the ban matters because as an individual ages, he or she might transition from the former category into the latter. Thus, the longer the ban, the worse the fit is likely to be.

As a practical matter, § 922(g)(9) imposes a permanent ban on Stimmel and on persons similarly situated. Congress has provided domestic-violence misdemeanants with four avenues to restore their federal firearm rights: (1) have the conviction set aside, (2) have the conviction expunged, (3) have their civil rights restored (assuming that the law of the applicable jurisdiction provides for the loss of civil rights for such an offense), or (4) seek a pardon.[1] 18 U.S.C.

---

[1]For the sake of completeness, it bears noting that the Gun Control Act includes a relief-from-disabilities program which permits a barred individual to "make application to the Attorney General for relief;" and should that application be denied, judicial review is available in federal district court. 18 U.S.C. § 925(c). This section of the Act is, however, "currently a nullity" as Congress defunded the program in 1992, which, in turn, stripped the federal courts of jurisdiction to review § 925(c) claims. *Tyler*, 837 F.3d at 682.

§ 921(a)(33)(B)(ii). However, as my colleagues acknowledge, under Ohio law, neither civil-rights restoration nor expungement is available to those convicted of misdemeanor domestic violence as an adult. Majority Op. at 11 n.7. Furthermore, while Ohio does have a procedure for setting aside convictions, it is limited to cases involving a "manifest injustice." Ohio Crim. R. 32.1. Given that "a postsentence withdrawal motion is allowable only in extraordinary cases," and because an "undue delay between the occurrence of the alleged cause for withdrawal and the filing of the motion is a factor adversely affecting the credibility of the movant and militating against the granting of the motion," *State v. Smith*, 361 N.E.2d 1324, 1326 (Ohio 1977), this route is also essentially foreclosed to Ohio domestic-violence misdemeanants who are seeking to restore their federal firearm rights decades after offending. Thus, Stimmel's only potential avenue to reacquiring those rights is to seek a pardon. Gubernatorial pardons are, however, uncommon events in Ohio. *See, e.g*, Alan Johnson*, Kasich Stays Conservative With Pardons*, Columbus Dispatch, Feb. 12, 2017, http://www.dispatch.com/news/20170211/kasich-stays-conservative-with-pardons (stating that in 2016, roughly three percent of clemency requests were approved, mostly for non-violent crimes); *see also* Restoration of Rights Project, *Ohio Restoration of Rights, Pardon, Expungement & Sealing*, http://ccresourcecenter.org/state-restoration-profiles/ohio-restoration-of-rights-pardon-expungement-sealing (last visited Jan. 3, 2018). Nor does there appear to be much urgency to pardon those convicted long ago of domestic violence crimes, albeit misdemeanors. *Cf. United States v. Skoien*, 614 F.3d 638, 653 (7th Cir. 2010) (Sykes, J., dissenting). Stimmel's firearm-ownership ban is therefore effectively permanent, meaning that some evidence of the continuing need to disarm those long ago convicted of misdemeanor domestic violence is necessary to justify § 922(g)(9)'s severe restriction.

None of the government's evidence establishes such a continuing need; in fact, the only direct evidence that is proffered contradicts the government's claim. As the majority concedes, after twenty years, "violent criminals present [only] a *slightly* higher risk of arrest than those without criminal records." Majority Op. at 13 (emphasis added) (citing Blumstein & Nakamura, *supra*, at 341–43). Admittedly, the cited study does not further refine this statistic, so we do not know whether it is true of domestic-violence misdemeanants. However, it does provide *prima facie* evidence that after a substantial passage of time, such individuals are about as likely as the

general public to commit an act of domestic violence. This data point is problematic for the government, because even under intermediate scrutiny, "[t]he burden of justification is demanding and . . . rests entirely on the State." *Tyler*, 837 F.3d at 693–94 (alteration in original).

The government's remaining evidence does nothing to refute this presumption. The other studies cited by the government, for instance, have timeframes that are too short to be relevant to the issue before us. The Cincinnati study lasted for only three years*, see* Majority Op. at 12, while the Stover article—which is the source of the much-touted 40%-to-80%-recidivism-rate statistic—based this figure upon experiments that lasted, at most, five years*, see* Stover, *supra*, at 450; Shepard, *supra*, at 167; Joel Garner, Jeffrey Fagan, & Christopher Maxwell, *Published Findings from the Spouse Assault Replication Program: A Critical Review*, 11 J. Quantitative Criminology, 3, 20 (Table V) (1995). Thus, these studies do not provide a basis for concluding that domestic violence misdemeanants pose a heightened risk decades after their offense.

Many of the government's "additional relevant data points" are not, in fact, relevant; they merely state the rather obvious facts that domestic violence is a serious problem in the United States and that the presence of a firearm increases the risk of death. *See* Majority Op. at 14–15. Taken together, such evidence suggests that having a firearm in the household increases the likelihood of homicide *if* domestic violence occurs. Such a conditional statement, however, cannot show that a given subset of the population—namely, domestic-violence misdemeanants who, decades later, have not reoffended—is more likely to use a firearm against a domestic partner than the general public. To do that, the government would have to demonstrate that those convicted of domestic-violence misdemeanors decades earlier commit acts of domestic violence at higher rates than the general public; and as shown above, it fails to do so. In short, the government cannot advert to facts that hold true of the population at-large to carry its burden of showing that a substantial relationship exists between § 922(g)(9) and the compelling government objective of curbing domestic firearm violence.

II

As the record currently stands, the government has not carried its burden even under intermediate scrutiny. Following *Tyler*'s lead, I would therefore reverse and remand, noting that

the government may still justify § 922(g)(9) either by providing evidence "explaining the necessity of § 922(g)[(9)]'s [effective] lifetime ban or . . . [by] showing that § 922(g)[(9)] is constitutional as applied to" Stimmel. 837 F.3d at 699. Perhaps such evidence exists; this court, however, cannot relieve the government of its burden to provide it.