# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39618**

———————————

**UNITED STATES**
*Appellee*

**v.**

**James S. SILVERNAIL, Jr.**
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 25 August 2021[1]

———————————

*Military Judge:* Mark F. Rosenow.

*Approved sentence:* Confinement for 2 years, forfeiture of all pay and allowances for 24 months, and reduction to E-1. Sentence adjudged 15 September 2018 by GCM convened at Joint Base Elmendorf-Richardson, Alaska.

*For Appellant:* Robert Feldmeier, Esquire (argued); Major Mark J. Schwartz, USAF.

*For Appellee:* Major Peter F. Kellett, USAF (argued); Colonel Shaun S. Speranza, USAF; Lieutenant Colonel Joseph J. Kubler, USAF; Lieutenant Colonel Brian C. Mason, USAF; Major Rachel S. Lyons, USAF; Mary Ellen Payne, Esquire; Kelsey MacLeod (legal intern).[2]

Before MINK, LEWIS, and ANNEXSTAD, *Appellate Military Judges.*

Senior Judge MINK delivered the opinion of the court, in which Senior Judge LEWIS and Judge ANNEXSTAD joined.

———————————

[1] We heard oral argument in this case on 21 July 2020. Judge D. Johnson sat for oral argument but did not participate in or vote on this opinion due to her retirement from the United States Air Force.

[2] Ms. MacLeod was supervised by an attorney admitted to practice before this court.

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————————

MINK, Senior Judge:

A general court-martial comprised of officer and enlisted members convicted Appellant, contrary to his pleas, of one specification of dereliction of duty, in violation of Article 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 892 (Charge I); four specifications of assault consummated by a battery and two specifications of aggravated assault, in violation of Article 128, UCMJ, 10 U.S.C. § 928 (Charge III); and one specification of unlawful possession of a firearm as assimilated under 18 U.S.C. § 922(g)(9), in violation of Article 134, UCMJ, 10 U.S.C. § 934 (Charge IV).[3,4] The court-martial sentenced Appellant to confinement for two years, forfeiture of all pay and allowances,[5] and reduction to the grade of E-1.

———————————————

[3] All references in this opinion to the UCMJ, Rules for Courts-Martial (R.C.M.), and Mil. R. Evid. are to the *Manual for Courts-Martial, United States* (2016 ed.).

[4] One specification of assault consummated by a battery of which Appellant was found guilty was originally charged as a specification of aggravated assault in violation of Article 128, UCMJ. The court members found Appellant guilty of the lesser-included offense. In addition, the military judge directed a finding of not guilty to one specification of assault consummated by a battery, in violation of Article 128, UCMJ, after trial defense counsel filed a motion for a finding of not guilty in accordance with R.C.M. 917. Appellant also pleaded not guilty to two specifications of making a false official statement in violation of Article 107, UCMJ, 10 U.S.C. § 907 (Charge II). The military judge directed a finding of not guilty as to certain language in one of the Article 107, UCMJ, specifications after trial defense counsel filed a motion for a finding of not guilty in accordance with R.C.M. 917. The court members found Appellant not guilty of the remainder of that specification and not guilty of the second specification of making a false official statement.

[5] Appellant has not raised as error the fact that the court-martial did not specify a time limit for the adjudged forfeitures of all pay and allowances. We note that for any period of time Appellant remained in a duty status, but was not confined, the maximum amount of allowed forfeitures was two-thirds pay per month. *See United States v. York*, 53 M.J. 553, 554 (A.F. Ct. Crim. App. 2000). However, where a sentence to forfeiture of all pay and allowances is adjudged such sentence "shall run until such time as the servicemember is discharged or returns to a duty status, whichever comes first, unless the sentencing authority expressly provides for partial forfeitures post-confinement." *United States v. Stewart*, 62 M.J. 291, 293–94 (C.A.A.F. 2006).

The convening authority approved the sentence as adjudged except as to the forfeiture of all pay and allowances. Upon taking action, the convening authority suspended the forfeiture of pay and allowances for three months, at which time that portion of the forfeitures would be remitted and the collection of the "remaining" 21 months of forfeitures would begin.[6] The convening authority also deferred all of the adjudged and mandatory forfeitures until the date of action, and waived the mandatory forfeiture of Appellant's pay and allowances for the benefit of Appellant's dependent child for a period of six months, release from confinement, or expiration of term of service, whichever was sooner, with the waiver commencing 14 days after announcement of sentence on 29 September 2018.

Appellant raises eight issues on appeal, which we reordered in this opinion: (1) whether the evidence is legally and factually sufficient to sustain Appellant's convictions as to Charges I, III, and IV; (2) whether the military judge erred by denying the defense motion to sever; (3) whether Charge I was barred by the statute of limitations; (4) whether Charges I and IV are constitutional as applied to Appellant;[7] (5) whether the military judge abused his discretion when he refused to grant a mistrial; (6) whether Appellant received ineffective assistance of counsel from his civilian defense counsel when he failed to object to the testimony of the Government's expert witness; (7) whether the military judge abused his discretion when he refused to allow the defense expert to testify as an expert witness; and (8) whether the military judge erred by denying the defense motion to compel discovery of social media communications between two of the witnesses in the case.[8] We also considered whether Appellant is entitled to relief for facially unreasonable appellate delay. During our review, we noted that the convening authority's action omitted language ordering Appellant's sentence executed. We find no error that materially prejudiced Appellant's substantial rights, and we affirm the findings and the sentence.

## I. BACKGROUND

Appellant was stationed at Little Rock Air Force Base (AFB), Arkansas, when he first met DS, a civilian woman, in 2009. They married later that same year and their daughter was born in 2010. Due to permanent change of station

---

[6] Appellant raised no issue regarding the convening authority's approval of the forfeiture of pay and allowances, and we find no prejudicial error.

[7] We heard oral argument on issues (3) and (4).

[8] Appellant personally raised issues (6), (7), and (8) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). We have carefully considered these issues and find they warrant neither further discussion nor relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

(PCS) orders, Appellant, DS, and their daughter moved to Joint Base Elmendorf-Richardson (JBER), Alaska, in May 2013.

While living in Alaska, DS became friends with LM, a retired military member, who was married to PM, a civilian. In 2017, PM contacted one of his friends who worked as a detective for the security forces (SF) investigations office at JBER and reported that LM had information about alleged acts of domestic violence by Appellant against DS. As a result, SF initiated an investigation of Appellant. While performing a background check on Appellant, one of the SF investigators discovered Appellant had been convicted of domestic battery in Arkansas in 2008. Further investigation discovered Appellant had been convicted of domestic battery in the third degree, a Class A misdemeanor, in violation of Section 5-26.305 of the Arkansas Code, against a former girlfriend, EA.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant contends that his convictions on the charges and specifications are both legally and factually insufficient.[9] With respect to the dereliction of duty offense (Charge I and its specification), Appellant argues the conviction is factually insufficient because the evidence shows he disclosed the fact that he had been convicted in an Arkansas state court of a qualifying domestic violence offense. Similarly, for the Article 134, UCMJ, offense (Charge IV and its specification), Appellant argues that the Government failed to prove that he possessed any of the firearms "in or affecting" interstate commerce as alleged. With respect to the specifications Appellant was convicted of relating to the various domestic violence offenses against DS (Specifications 1 through 4, 7, and 8 of Charge III), Appellant's argument is two-fold: (1) DS fabricated the allegations of domestic violence by Appellant to cover up her inappropriate relationship with Detective DB, and (2) no evidence directly corroborates DS's testimony. We disagree with Appellant's contentions and find his convictions both legally and factually sufficient.

#### 1. Law

We only affirm findings of guilty that are correct in law and fact and, "on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence

---

[9] For the most part, Appellant's specific arguments address factual insufficiency. Our later analysis will address both legal and factual sufficiency.

produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). Circumstantial evidence may suffice. *See United States v. Kearns*, 73 M.J. 177, 182 (C.A.A.F. 2014) (citing *Brooks v. United States*, 309 F.2d 580, 583 (10th Cir. 1962)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

The Gun Control Act of 1968 established a ban on firearms possession for certain individuals including persons convicted of a crime punishable by imprisonment for a term exceeding one year. *See* Pub. L. 90-618 § 102, 82 Stat. 1213, 1220 (22 Oct. 1968); 18 U.S.C. § 922(g)(1). In 1996, the 104th Congress enacted the "Gun Ban for Individuals Convicted of a Misdemeanor Crime of Domestic Violence," which bans access to firearms by persons convicted of a misdemeanor crime of domestic violence. *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. 104-208, § 658, 10 Stat. 3009-37 (30 Sep. 1996). Provisions of the Domestic Violence Offender Gun Ban, enumerated in 18 U.S.C § 922(g)(9) and known as the "Lautenberg Amendment," provide, in pertinent part, that "it shall be unlawful for any person . . . who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any

firearm or ammunition . . . ." The Department of Defense imposes an "affirmative, continuing obligation" upon servicemembers "to inform commanders or supervisors if they have, or later obtain, a qualifying conviction." *See* Department of Defense Instruction (DoDI) 6400.06, *Domestic Abuse Involving DoD Military and Certain Affiliated Personnel*, ¶ 6.1.4.5.1.1 (21 Aug. 2007, Change 4 dtd 26 May 2017). "For purposes of this instruction . . . the term 'qualifying conviction' applies to . . . [a] State or Federal conviction for a misdemeanor crime of domestic violence." *Id.* at ¶ E2.24.

### 2. Analysis

#### a. Dereliction of Duty (Charge I)

In order to find Appellant guilty of willful dereliction of duty, as charged, the Government was required to prove beyond a reasonable doubt: (1) that Appellant had a certain duty, that is to refrain from possessing Government-issued firearms without informing his supervisors of his qualifying domestic violence conviction under 18 U.S.C. § 922(g)(9); (2) that Appellant knew or reasonably should have known of the duty; (3) that the duty was affirmative and continuing; and (4) that within the United States, on divers occasions, between on or about 9 January 2013 and on or about 19 September 2017, Appellant was willfully derelict in the performance of the duty by willfully possessing Government-issued firearms without informing his supervisors of his qualifying domestic violence conviction under 18 U.S.C. § 922(g)(9). *See Manual for Courts-Martial, United States* (*MCM*), pt. IV, ¶ 16.b.(3). "A duty may be imposed by treaty, statute, regulation, lawful order, standard operating procedure, or custom of the service." *MCM*, pt. IV, ¶ 16.c.(3)(a). "Actual knowledge of duties may be proved by circumstantial evidence. Actual knowledge need not be shown if the individual reasonably should have known of the duties." *MCM*, pt. IV, ¶ 16.c.(3)(b). A "person is derelict in the performance of duties when that person willfully or negligently fails to perform that person's duties or when that person performs them in a culpably inefficient manner." *MCM*, pt. IV, ¶ 16.c.(3)(c). "Willful" is defined as "intentional." *MCM*, pt. IV, ¶ 16.c.(3)(c).

The evidence at trial shows that while in Arkansas in 2008, Appellant was convicted of domestic battery which qualified as a domestic violence conviction under the Lautenberg Amendment. The Department of Defense imposes an "affirmative, continuing obligation" upon servicemembers "to inform commanders or supervisors if they have, or later obtain, a qualifying conviction" under the Lautenberg Amendment. The Department of Defense (DD) Form 2760, *Qualification to Possess Firearms or Ammunition*, "shall be made available for use by those personnel who come forward to report a qualifying conviction in compliance with their obligation to do so." DoDI 6400.06 at ¶ 6.1.4.5.1.4.1. Witnesses from Appellant's current and prior units testified as

to their knowledge of unit requirements to recertify annually[10] the absence of any such qualifying conviction. The witnesses identified DD Form 2760 as the form on which they accomplished the annual recertification. A blank copy of the form was admitted into evidence as a prosecution exhibit. The DD Form 2760 states that a servicemember has "a continuing obligation" to inform leadership of any qualifying conviction. SSgt JC, one of Appellant's co-workers at JBER, testified that a "Lautenberg Notice" stating the requirement to disclose any such qualifying conviction that would prevent the use or possession of a firearm was posted on the door of the armory in Appellant's duty location. Photographs of the "Lautenberg Notice" posted on the armory door were admitted into evidence as a prosecution exhibit.

Appellant handled Government-issued firearms as evidenced by his training record, which documented Appellant completed three separate tasks that involved training with weapons at the JBER armory. Appellant asserts that he complied with the requirement of disclosing his qualifying conviction as evidenced by the fact that his conviction was referenced in his enlisted performance report that closed out on 6 December 2008 at Little Rock AFB. Appellant asserts that he had no "continuing" duty to report. Even in the absence of a DD Form 2760 signed by Appellant during the charged timeframe, the testimony of Appellant's co-workers indicated that it was a standard operating procedure of the unit to recertify annually the absence of a Lautenberg qualifying conviction.

We conclude that Appellant clearly knew or should have known of this duty as evidenced by the posted "Lautenberg Notice" on the armory door of his duty location. Appellant's training records further establish that he possessed Government-issued firearms during the charged timeframe. Appellant's training records dated June 2016 reflecting the tasks on which Appellant was trained were admitted into evidence as a prosecution exhibit. SSgt JC testified that the "aircrew armory" training tasks that Appellant completed included, "arms room and clearing barrel attendant responsibilities, weapons issue, load clearing receipt, turn-in and formal weapons inspection."

After considering the evidence in the light most favorable to the Government, we conclude that a rational factfinder could find all of the elements of

---

[10] DoDI 6400.06, ¶ 6.1.4.5.1, states, "Military personnel shall be periodically informed of the Domestic Violence Amendment to the Gun Control Act . . ." and the DoD's implementing procedures. A witness from Appellant's unit at Little Rock AFB testified that the annual requirement to sign the DD Form 2760 coincided with a firearms training requirement. The witness explained "we have to keep current on M-9s because we issue them."

willful dereliction of duty beyond a reasonable doubt. Therefore, we find Appellant's conviction of dereliction of duty legally sufficient. Similarly, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we ourselves are convinced of Appellant's guilt of willful dereliction of duty beyond a reasonable doubt and therefore find his conviction factually sufficient.

### b. *Unlawful Possession of a Firearm (Charge IV)*

In order to find Appellant guilty of unlawful possession of a firearm to the prejudice of good order and discipline, the Government was required to prove beyond a reasonable doubt: (1) that within the United States on divers occasions, between on or about 9 January 2013 and on or about 30 November 2017, Appellant unlawfully possessed a firearm, in or affecting interstate commerce, in violation of 18 U.S.C. § 922(g)(9); and (2) that under the circumstances the conduct of Appellant was to the prejudice of good order and discipline in the Armed Forces. *See MCM*, pt. IV, ¶ 60.b.(1); 18 U.S.C. § 922(g)(9). Conduct that is prejudicial to good order and discipline is described as those "acts directly prejudicial to good order and discipline and not to acts which are prejudicial only in a remote or indirect sense. . . . It is confined to cases in which the prejudice is reasonably direct and palpable." *MCM*, pt. IV, ¶ 60.c.(2)(a). The military judge defined interstate commerce for the court members as "commerce between any place in a state and any place outside of that state; but, such term does not include commerce between places within the same state; but, through any place outside of that state."

As noted above, Appellant was convicted of domestic battery in Arkansas in 2008. In accordance with 18 U.S.C. § 922(g)(9), Appellant was prohibited from possessing firearms. The evidence produced at trial included two bills of sale from Arkansas establishing that Appellant purchased one firearm each from two civilian individuals, GP and MH. Both of the civilians testified that they sold a firearm to Appellant in Arkansas. Each bill of sale identified the firearm by its serial number. DS testified that when moving pursuant to PCS orders from Arkansas to Alaska, all of Appellant's guns were packed and shipped to Alaska by the Government-contracted movers. The household goods inventory created by the movers reflected 15 firearms owned and shipped by Appellant. Two of those firearms were identified by serial number as the firearms Appellant had purchased from GP and MH. One of the sellers, MH, testified that Appellant identified himself as a military member by providing MH

with his military identification card when purchasing the firearm from him.[11] In addition, each bill of sale required the buyer to certify that he had not been convicted of misdemeanor domestic battery.

Appellant challenges his conviction on this offense primarily on factual sufficiency grounds. Specifically, Appellant contends that the Government failed to prove that he possessed a firearm "in or affecting" interstate commerce. He argues that Government-contracted movers took possession of his firearms and transported them from Arkansas to Alaska, and that he did not have possession of the firearms during the period when they were moving in interstate commerce. We disagree with Appellant's contention that he did not have possession of the firearms during their transport from Arkansas to Alaska. While the firearms may not have been in Appellant's physical custody during the transport,[12] the firearms were in his physical possession in both Arkansas and Alaska and in his constructive possession during transit. Appellant availed himself of a Government-paid move pursuant to PCS orders. Appellant placed his firearms in the physical custody of the movers but never relinquished ownership or any expectation that the firearms were his property or that he would not retake physical possession in Alaska. In addition, the evidence at trial established that Appellant possessed the firearms on divers occasions, in both Arkansas and Alaska.

We conclude that a rational factfinder could find all of the elements of unlawful possession of a firearm in or affecting interstate commerce to the prejudice of good order and discipline by Appellant beyond a reasonable doubt. Therefore, we find Appellant's conviction to be legally sufficient. After carefully considering the evidence presented at trial in a light most favorable to the Government, we ourselves are convinced of Appellant's guilt of unlawful possession of a firearm and find his conviction of this offense factually sufficient.

### c. Assault Offenses against DS (Charge III)

Appellant was convicted of four specifications of assault consummated by a battery and two specifications of aggravated assault.

---

[11] This firearm bill of sale lists Appellant's name and bears his signature but it does not include his address, driver's license number, or phone number. MH explained in his testimony that some of these sections of the form were blank because Appellant presented his military identification card instead of his driver's license.

[12] *See United States v. Dolen*, 7 C.M.R. 666, 671 (A.F.B.R. 1952) (applying the ordinary legal significance of the term bailment as the delivery of personal property to another for a specific purpose and stating after creation of a bailment, the bailor retains title to, and ownership of, the property) (citations omitted).

In order to find Appellant guilty of assault consummated by a battery, the Government was required to prove beyond a reasonable doubt: (1) that Appellant did bodily harm to a particular person, and (2) that the bodily harm was done with unlawful force or violence in the manner alleged. *See MCM*, pt. IV, ¶ 54.b.(2). "Bodily harm" is defined as "any offensive touching of another, however slight," and the act "must be done without legal justification or excuse and without the lawful consent of the person affected." *MCM*, pt. IV, ¶ 54.c.(1)(a). "Unlawful force or violence" is demonstrated if an accused "wrongfully caused the contact, in that no legally cognizable reason existed that would excuse or justify the contact." *United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011) (citation omitted).

In order to find Appellant guilty of aggravated assault, the Government was required to prove beyond a reasonable doubt: (1) that Appellant did bodily harm to a particular person; (2) that Appellant did so with a certain force; (3) that the bodily harm was done with unlawful force or violence in the manner alleged; and (4) that the force was used in a manner likely to produce death or grievous bodily harm. *See MCM*, pt. IV, ¶ 54.b.(4). "Other means or force" is described as including "any means or instrumentality not normally considered a weapon. When the natural and probable consequence of a particular use of any means or force would be death or grievous bodily harm, it may be inferred that the means or force is 'likely' to produce that result." *MCM*, pt. IV, ¶ 54.c.(4)(a)(ii). "Grievous bodily harm" is defined as "serious bodily injury." *MCM*, pt. IV, ¶ 54.c.(4)(a)(iii).

Appellant was convicted of one specification of assault consummated by a battery for unlawfully spitting on DS's face on divers occasions between 9 January 2013 and 19 August 2017. At trial, DS testified that she was apprehensive about the family's move to Alaska in 2013 because it was far from home for her and a place where she had no family or friends. She explained that this caused tension between her and Appellant after the move as they worked to get the family settled in Alaska. Eventually, DS began work as an optician in Eagle River, Alaska. DS testified that throughout their marriage, Appellant "spit on [her] many, many times." DS stated Appellant "would just be angry about something and . . . as he's walking away or walking out the door, he would just spit in [her] face." She testified that it was not accidental, and she could not estimate the number of times he had done so during the time they had lived in Alaska.

Appellant was convicted of one specification of assault consummated by battery and one specification of aggravated assault arising out of an incident that occurred on or about 20 July 2013. The assault consummated by a battery specification alleged that on or about 20 July 2013 in Alaska, Appellant struck DS in the stomach with his fist. The aggravated assault specification alleged

that on that same date and in the same place, Appellant strangled DS's neck with his hands with a force likely to produce death or grievous bodily harm. At trial, DS testified about an incident that occurred in the kitchen of their house in Anchorage, Alaska, around 20 July 2013. DS stated that following a "heated" argument between her and Appellant, Appellant "punched [her] a few times in the stomach and choked [her] twice." She described doubling "over a bit in pain." She also described the "choking" as "[she] couldn't breathe and he knew that [she] was about to pass out, and then, he would let [her] breathe for a second and then, he would choke [her] again." DS also described the "choking" as Appellant having both hands around her neck. She testified that she experienced a "lot of pain" and could not "breathe or talk." DS also stated that she had pain when swallowing for approximately a week after the incident.[13]

Appellant was convicted of another assault consummated by a battery—originally charged as an aggravated assault but resulted in a conviction for the lesser-included offense of assault consummated by a battery—for strangling DS's neck with his hand on or about 15 December 2015. DS testified that one morning in December 2015 in Alaska, DS asked Appellant to take their daughter to school since he had the day off. An argument ensued and continued from inside their house into their garage. During the argument, their daughter was inside Appellant's truck which blocked DS's car inside the garage. DS testified that Appellant pinned her against the back door of her car, with one hand around her neck and was pointing at her with the other hand while yelling at her. She distinguished this event in severity from the "choking" previously described, stating, "I mean, he was choking me but it wasn't as bad as normal. I mean, I could still form words. It's almost like he was just pinning me there instead of trying to suffocate me." DS testified that she was able to get away from Appellant, retrieve their daughter from Appellant's truck, and move to another part of the garage, where Appellant pursued her. DS described their daughter as intervening, and saying "no, daddy, no." DS testified that she told several co-workers about this incident and moved out of the house soon after. One of DS's co-workers testified that DS told her in August 2013 and again in December 2015 that Appellant had physically abused DS. Approximately six months after the December 2015 incident, DS moved back into the home with Appellant.

Appellant was convicted of one specification of assault consummated by battery and one specification of aggravated assault arising out of an incident that occurred on or about 19 August 2017. The assault consummated by a battery specification alleged that on or about 19 August 2017 in Alaska, Appellant

---

[13] The military judge granted the defense motion to merge the specifications related to the July 2013 incident for purposes of sentencing.

struck DS in the body with his fist on divers occasions. The aggravated assault specification alleged that on the same date and at the same place, Appellant strangled DS's neck with his hands with a force likely to produce death or grievous bodily harm. DS testified that she and Appellant had an argument in August 2017 when she asked Appellant to help put away groceries. DS testified that Appellant punched her in the stomach "several times" while in the garage of their home. DS described feeling afraid because she felt like Appellant "couldn't control anything about himself." She called out to her daughter and screamed loudly in an effort to attract the attention of the neighbors. She testified that she tried to fight back, but her actions only seemed to make Appellant angrier. DS stated that Appellant "choked" her twice, using "both hands." DS remembered everything "kind of fading and going limp," and then Appellant let her go and after she was able to take a breath, he "start[ed] choking [her] again." She described what she experienced while Appellant choked her. DS said that she felt pressure, was unable to breathe or talk, heard a "womping" sound in her ears, and her vision went black for a second or two. The following day, on 20 August 2017, DS sent Appellant a text message, a copy of which was admitted into evidence as a prosecution exhibit. The message from DS to Appellant stated, "Btw, I'm sore from yesterday but luckily for you there are no marks on my face or stomach, my throat is a little bruised but no one will notice." DS testified that she had "fingerprint" bruises on her neck, pain swallowing, and a feeling like Appellant's "hands were still around [her] neck even three days later."[14]

On appeal, as at trial, the Defense attempts to impeach DS's credibility through several lines of attack. The Defense argues that despite DS's ability to be financially independent from Appellant and provide for herself and her daughter, she moved back in with Appellant following one or more of the alleged assaults. The Defense points to social media posts and other statements by DS that were very positive about Appellant. The Defense argues that there were no photographs of any injuries, that DS made no police reports, and no witnesses, including DS's friends and co-workers, saw marks or bruising following the assaults. The Defense also argues that DS and Appellant were in the midst of divorce proceedings at the time of trial and that custody of their daughter was a contentious issue. The Defense points to DS's repeated requests to Detective DL for information regarding the domestic violence investigation. The Defense also suggests that DS was involved in some form of inappropriate relationship with Detective DB, who at the time of trial was the subject of a commander's investigation regarding his role as a supervisor in the investigation of Appellant. Detective DL testified that he was "uncomfortable"

---

[14] The military judge granted a defense motion to merge the specifications related to the August 2017 incident for purposes of sentencing.

with the relationship between Detective DB and DS and felt that it was "inappropriate." However, both Detective DB and DS testified that they were only friends, and the Defense presented no evidence to the contrary.

Despite the Defense suggestions regarding DS's divorce and child-custody proceedings, it is undisputed that DS did not initially bring the evidence of domestic violence by Appellant to the attention of authorities. The evidence showed that she had been confiding in her friends, LM and PM, about the assaults since 2015, when they helped her move out of her house the first time. It was not until after the incident in August 2017 that PM reported the alleged assault to authorities. At trial, Detective DL confirmed that it was someone other than DS that made the initial report. He testified that when he first met with DS, his perception was that she did not want to talk to investigators or be involved in the investigation.

Appellant exposed all of these concerns during the trial. The court members were able to assess DS's credibility and observe her demeanor in court, including during the cross-examination by trial defense counsel. Based upon her testimony alone, a rational factfinder could conclude beyond a reasonable doubt that each of these assaults occurred.

In assessing legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Prosecution. The bulk of the evidence produced at trial supporting these offenses was provided by DS's testimony. While not all the evidence was free from conflict, it did not have to be. *See Wheeler*, 76 M.J. at 568 (citation omitted). We conclude that a rational factfinder could have found beyond a reasonable doubt all the elements to support Appellant's convictions on the four specifications of assault consummated by a battery and on the two specifications of aggravated assault. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. *See Turner*, 25 M.J. at 325. Therefore, we find Appellant's convictions both legally and factually sufficient.

## B. Appellant's Motion to Sever

Appellant contends that the military judge abused his discretion by deciding not to sever the domestic violence offenses from the other offenses charged in Appellant's case because of the likelihood of impermissible spillover. We disagree.

### 1. Additional Background

As noted above, the charges and specifications originally preferred against Appellant included allegations of dereliction of duty, making false official

statements, unlawfully possessing a firearm, and eight specifications of aggravated assault and assault consummated by a battery against his spouse, DS. Prior to trial, the Defense moved to sever all of the specifications pertaining to dereliction of duty, false official statement, and unlawfully possessing a firearm from the specifications pertaining to the domestic violence offenses. In the alternative, the Defense asked the military judge to require the Government to give separate opening statements, presentation of the evidence, and closing arguments; that there be separate findings instructions and separate worksheets for the domestic violence offenses and the other offenses; and for the military judge to give a "tailored spillover instruction to guard against 'manifest injustice.'" The Government opposed the motion.

After conducting an Article 39(a), UCMJ, 10 U.S.C. § 839(a), hearing and receiving additional evidence and argument from counsel, the military judge denied the motion to sever. In a written ruling issued prior to authentication of the record of trial, he analyzed the three factors identified in *United States v. Curtis*, 44 M.J. 106, 128 (C.A.A.F. 1996), *rev'd as to sentence on recon*, 46 M.J. 129 (C.A.A.F. 1997) (per curiam), and articulated in *United States v. Southworth*, 50 M.J. 74, 76 (C.A.A.F. 1999): "(1) whether the evidence of one offense would be admissible proof of the other; (2) whether the military judge has provided a proper limiting instruction; and (3) whether the findings reflect an impermissible crossover."

While acknowledging that the Government had not conceded the first factor, the military judge assumed this factor favored the Defense "for the purpose of resolving the motion." However, the military judge did not find this factor dispositive and instead found that the remaining two factors weighed against severance. The military judge concluded that "no manifest injustice" would result if all of the alleged offenses were tried together. *See* R.C.M. 906(b)(10). However, as part of this ruling, the military judge directed the Government "to frame its opening statement, closing argument and cross examination of the accused – in the event he elects to testify – so as to maintain separation" between the domestic violence specifications and the other specifications. The military judge further required the Government:

> [T]o specifically identify the complete scope of the anticipated testimony and evidence intended to be offered to prove the accused's "qualifying domestic violence conviction" in support of the allegations [of dereliction of duty and unlawfully possessing a firearm as conduct prejudicial to good order and discipline] in a session outside the presence of the court members so that any additional objections may be raised and ruled upon.

During the presentation of evidence during the findings case, Detective DL stated that during his background investigation of Appellant, he discovered

that Appellant had a "conviction from 2008 in Arkansas for a . . . qualifying domestic violence conviction for Lautenberg." Trial defense counsel immediately objected, and the military judge sustained the objection, instructing the court members:

> Members, you'll disregard that portion of the witness's response. Let me be plain, no witness can testify that they believe any other witness or that any other witness's account is credible or true, or whether a crime occurred. To the extent that you believe that this witness has so testified, you'll disregard that portion of his testimony. You can consider his response that he found a database revealing a conviction from 2008 in Arkansas. You'll disregard the portion of his response characterizing it as a qualifying domestic violence conviction. This instruction will be included, at least in broad strokes, in my written instructions at the end of the case. Additionally, this rule applies to the earlier testimony that you've received from [DS] on this point, where at various times, she sponsored what another witness may or may not have believed about her account. You are going to get that instruction at the end, but since I'm giving it to you now, I figured I would surface that concern as well. So, again, one more time to be clear, no witness can testify that they believe another witness's account is true or that a crime occurred. It's for you to make those determinations. Witnesses tell you what the evidence is. I tell you what the law is. And, then, you make your determination on the findings in this case. Does every member understand and can you follow along with the court's instruction?

The court members responded that they could do so, and the Defense requested no further instructions at that point. Later, when instructing the court members with respect to findings, the military judge stated, *inter alia*:

> An accused may be convicted based only on evidence before the court and not on evidence of a general criminal disposition. Each offense must stand on its own and you must keep the evidence of each offense separate. Stated differently, if you find or believe that the accused is guilty of one offense, you may not use that finding or belief as a basis for inferring, assuming, or proving that he committed any other offense.

> If evidence has been presented which is relevant to more than one offense, you may consider that evidence with respect to each offense to which it is relevant. . . .

The burden is on the prosecution to prove each and every element of each offense, beyond a reasonable doubt. Proof of one offense carries with it no inference that the accused is guilty of any other offense.

I just instructed you that you may not infer the accused is guilty of one offense because his guilt may have been proven on another offense, and that you must keep the evidence with respect to each offense separate. However, there is an exception to this prohibition. Evidence of the accused's knowledge of his assigned duty, if any, may be considered as part of your deliberations on the specification of Charge I.[15] It may also be considered for its bearing on whether, under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the Armed Forces as alleged in the specification of Charge IV.

You have received evidence that the accused may have been previously convicted for an offense [of domestic battery]. You may consider this evidence, whether from those exhibits or any other evidence and testimony admitted, in determining the weight and significance, if any, to be given to the other evidence and testimony in this case. You may not consider this evidence, however, in determining the accused's guilt of any of the allegations in Charge III and its specifications.[16] The fact that the accused may have been previously convicted for an offense will have no bearing on the allegations of aggravated assault and assault consummated by a battery. Further, you may not conclude from this evidence that the accused is a bad person or has general criminal tendencies and that he therefore committed any of the offenses charged.

The military judge also provided additional tailored instructions to the court members as to how they could properly use evidence of Appellant's uncharged misconduct.[17]

---

[15] Charge I and its specification was the alleged dereliction of duty offense.

[16] Charge III and its specifications were the alleged domestic violence offenses.

[17] After cross-examination of DS, the military judge admitted limited purpose testimony under Mil. R. Evid. 404(b) that Appellant "may have physically and emotionally abused" DS prior to 9 January 2013, a time period outside of the five-year statute of limitations.

16

**2. Law**

We review a military judge's ruling on a motion to sever for an abuse of discretion. *United States v. Giles*, 59 M.J. 374, 378 (C.A.A.F. 2004) (citation omitted). "A military judge abuses his discretion when his findings of fact are clearly erroneous, when he is incorrect about the applicable law, or when he improperly applies the law." *United States v. Roberts*, 59 M.J. 323, 326 (C.A.A.F. 2004).

"Under R.C.M. 906(b)(10), a military judge is required to grant a severance motion when necessary to avoid a 'manifest injustice.'" *Giles*, 59 M.J. at 378. On appeal, "the appellant must demonstrate more than the fact that separate trials would have provided a better opportunity for an acquittal[;]" he must demonstrate "the ruling caused actual prejudice by preventing the appellant from receiving a fair trial." *Id.* (citations omitted). Appellate courts review such rulings by applying the following factors: "(1) Do the findings reveal an impermissible crossover of evidence? (2) Would the evidence of one offense be admissible proof of the other? (3) Did the military judge provide a proper limiting instruction?" *Id.* (citing *Curtis*, 44 M.J. at 128).

Court members are presumed to follow the military judge's instructions in the absence of evidence to the contrary. *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted).

**3. Analysis**

The military judge did not abuse his discretion in concluding severance was not required in order to prevent manifest injustice to Appellant. Anticipating the evidence that would be presented in this case, the military judge acknowledged the importance placed on the presumption of innocence and the obligation of court members to follow the law in general voir dire would be of "particular emphasis" in Appellant's case. The military judge reasonably anticipated that he would give a "tailored instruction explaining the permitted uses – if any – of the evidence admitted to prove one offense with respect to another if [Appellant] maintains his election to be tried by members," which Appellant did. The military judge also found that the clear legal and factual distinctions between the alleged offenses pertaining to domestic violence and all of the other offenses made the risk of "impermissible crossover unlikely."

As noted above, the military judge did give appropriate limiting instructions, and the Government generally adhered to his directions to present its opening statement and closing argument in a manner that maintained separation between the offenses. The military judge also required the Government to "specifically identify the complete scope of the anticipated testimony and evidence intended to be offered to prove [Appellant]'s 'qualifying domestic violence conviction' . . . in a session outside the presence of the court members so

that any additional objections may be raised and ruled upon." Reviewing the record as a whole, we find no indication the court members failed to follow the military judge's instruction or impermissibly relied on evidence of any other offense in order to find Appellant guilty of the domestic violence offenses.

Despite Appellant's argument to the contrary, we find that the military judge's limiting instruction was tailored to address the specific evidence in this case. The military judge clearly recognized the potential impact of the evidence of Appellant's prior domestic violence conviction and tailored his instruction to caution the court members about the permissible and impermissible uses of that evidence. As the Government points out, the court members' findings of not guilty as to some of the domestic violence offenses supports the conclusion that the court members followed the military judge's instructions. We do not agree with Appellant's contention that the evidence supporting the domestic violence offenses was weak, and that there was a "high likelihood of impermissible crossover when weak evidence supports a charge." *See Curtis*, 44 M.J. at 128. The sufficiency of the evidence as to each of the offenses of which Appellant was convicted is discussed above, and we find that the joinder of the offenses in this case did not create an impermissible risk of spillover or any other manifest injustice. We find that the military judge's findings of fact were supported by the evidence in the record, and that he correctly applied the law to the facts. Accordingly, we conclude the military judge did not abuse his discretion.

## C. Statute of Limitations

Appellant asserts that his conviction of dereliction of duty, alleging he possessed Government-issued firearms without informing his supervisors of his prior domestic violence conviction, was barred by the statute of limitations. Appellant argues that the act or omission giving rise to the duty for which he was allegedly derelict arose more than five years prior to receipt of the charge and its specification by the summary court-martial convening authority. We disagree.

### 1. Additional Background

As noted above, in 2008 Appellant was convicted in Arkansas for domestic battery against his girlfriend at that time, EA.

The summary court-martial convening authority receipted for the sworn charges in Appellant's case on 9 January 2018. At his court-martial, on 15 September 2018, Appellant was convicted for being derelict in the performance of his duties by willfully possessing Government-issued firearms on divers occasions between on or about 9 January 2013 and on or about 19 September 2017 without informing his supervisors of his qualifying domestic violence conviction "as it was his continuing, affirmative duty to do."

**2. Law**

The statute of limitations applicable to a particular offense is a question of law, which appellate courts review de novo. *United States v. Lopez de Victoria*, 66 M.J. 67, 73 (C.A.A.F. 2008) (citation omitted).

Article 43(b)(1), UCMJ, 10 U.S.C. § 843(b)(1), provides in pertinent part that "[a] person charged with an offense is not liable to be tried by court-martial if the offense was committed more than five years before the receipt of sworn charges and specifications by an officer exercising summary court-martial jurisdiction over the command."

**3. Analysis**

On appeal, Appellant argues that his failure to report his qualifying domestic violence misdemeanor offense occurred at the time of his conviction in Arkansas in 2008 and was completed at that time. Consequently, Appellant concludes, the statute of limitations had run by 2013, several years prior to the receipt of court-martial charges by the summary court-martial convening authority in 2018 in this case. Appellant relies on the United States Supreme Court opinion in *Toussie v. United States*, 397 U.S. 112 (1970), in support of his argument that the failure to report the qualifying offense was not a "continuing offense" and therefore, was completed in 2008. In *Toussie*, the Supreme Court held that the obligation to register for the Selective Service Act within five days of the appellant's eighteenth birthday was not a "continuing offense," relying on Congress's silence on whether it intended the failure to register to be a continuing offense. *Id.* at 120–21.

The Government acknowledges some similarities between the duties imposed to register in *Toussie* and to report in this case, but argues that *Toussie* is not dispositive on the issue of whether the obligation to report the qualifying domestic violence conviction is a continuing offense. The Government points to the language of paragraph 6.1.4.5.1.1 of DoDI 6400.06 as "unambiguously" imposing an "affirmative, continuous obligation" to report the conviction.

We agree that *Toussie* is not dispositive on the issue of whether the statute of limitations lapsed in this case. While 18 U.S.C. § 922(g)(9) may not have specified by its terms that it was a continuing offense, Appellant was charged and convicted with being derelict in the performance of his duties on divers occasions. The duty of which Appellant was convicted was imposed by DoDI 6400.06, which clearly described the duty as an "affirmative, continuing" one. As a result, Appellant had an ongoing duty to inform his supervisors of the qualifying conviction during the charged timeframe. The evidence established that Appellant was provided Government-issued firearms within the statute of limitations and willfully failed to report his qualifying conviction as he was

required to do at the time he received the Government-issued firearms. In addition, DoDI 6400.06 contains no provision that would have relieved Appellant from reporting his qualifying conviction at a new duty station even if he had reported it at a prior duty station. Therefore, the dereliction of duty offense for which Appellant was convicted was not barred by the statute of limitations.

## D. Constitutional Challenges

On appeal, for the first time Appellant asserts as a single assignment of error that Charge IV, alleging that he unlawfully possessed a firearm in or affecting interstate commerce in violation of Article 134, UCMJ, is unconstitutional as applied to him. Appellant also asserts that if he was subject to a "continuing" duty to report a Lautenberg qualifying offense to his supervisors as alleged in Charge I, that charge is also unconstitutional as applied to him. Specifically, Appellant contends these charges deprive him of his Second Amendment[18] right to keep and bear arms. We are not persuaded that either offense is unconstitutional as applied to Appellant.

### 1. Additional Background

As noted above, Appellant was convicted of being willfully derelict in the performance of his duty on divers occasions by possessing a Government-issued firearm without informing his supervisors of his qualifying conviction under the Lautenberg Amendment. Appellant was also convicted of unlawfully possessing a firearm in or affecting interstate commerce on divers occasions, in violation of 18 U.S.C. § 922(g)(9), such conduct being to the prejudice of good order and discipline.

### 2. Law

We review the constitutionality of a statute de novo. *United States v. Ali*, 71 M.J. 256, 265 (C.A.A.F. 2012) (citing *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005)).

The Second Amendment to the United States Constitution states that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment confers upon an individual the right to keep and bear arms. Later, in *McDonald v. City of Chicago*, 561 U.S, 742 (2010), the Supreme Court held that the Second Amendment's individual right to keep and bear arms applies to the states through the Due Process Clause of the Fourteenth Amendment.[19]

---

[18] U.S. CONST. amend. II.

[19] U.S. CONST. amend. XIV.

In *United States v. Smith*, 56 M.J. 711, 716 (A.F. Ct. Crim. App. 2001), *rev. denied*, 56 M.J. 477 (C.A.A.F. 2002), this court addressed the issue of whether the Lautenberg Amendment was constitutional as applied to an individual in possession of a firearm after having been convicted of a misdemeanor crime of domestic violence. In *Smith*, the appellant was charged with violating 18 U.S.C. § 922(g)(9) by possessing a firearm after being convicted of a misdemeanor domestic violence offense under Ohio state law. *Id.* at 712. The appellant argued that 18 U.S.C. § 922(g)(9) unconstitutionally denied him the right to keep and bear arms under the Second Amendment. *Id.* at 716. Without deciding the appropriate standard of constitutional scrutiny, this court found "no merit in this argument," holding that "[r]egardless of whether the right conferred by the Second Amendment is 'individual' or 'collective' . . . . Congress has the power to regulate the interstate trade in firearms, and may act to stem the flow of guns to those whose convictions for domestic violence offenses reflect a propensity to inflict bodily harm upon others." *Id.* (citing *Gillespie v. City of Indianapolis*, 185 F.3d 693, 706 (7th Cir. 1999)).

### 3. Analysis

Relying on *Heller*, Appellant claims the Lautenberg Amendment is unconstitutional as applied to him. Specifically, Appellant argues that he cannot be deprived, for life, of his right to keep and bear arms based on a misdemeanor conviction. He further argues that statutes—such as the Lautenberg Amendment—restricting "core Second Amendment" protections are subject to "strict scrutiny." Consequently, Appellant contends that if he was under a "continuing" duty to report the Lautenberg qualifying offense, it is unconstitutional as applied to him because the Lautenberg Amendment "fails" under a strict scrutiny analysis.

At the outset we note that the "right of law-abiding, responsible citizens to use arms in defense of home and hearth," as recognized in *Heller* was not implicated by the dereliction of duty offense of which Appellant was convicted. *See Heller*, 554 U.S. at 635. As the Government correctly points out, the dereliction of duty offense of which Appellant was convicted related to his possession of *Government-issued* firearms.

Appellant argues that because *Smith* was decided before *Heller*'s recognition of an "individual" right to keep and bear arms, we should hold that *Smith* is no longer controlling and overrule it. We decline to do so. In *Smith*, this court recognized that Congress has the power to regulate the Second Amendment "regardless of whether the right conferred by the Second Amendment is 'individual' or 'collective.'" 56 M.J at 716. The Supreme Court's decision in *Heller* did not affect *Smith*'s conclusion that Congress "may act to stem the flow of guns to those whose convictions for domestic violence offenses reflect a propensity to inflict bodily harm upon others." *See* 56 M.J. at 716 (citation omitted).

In the years following the Supreme Court's decision in *Heller*, federal circuits that have considered a Second Amendment challenge to the Lautenberg Amendment, specifically Section 922(g)(9) of Title 18, have similarly upheld this statute, though "under varying frameworks and rationales." *Stimmel v. Sessions*, 879 F.3d 198, 203 (6th Cir. 2018) (citations omitted).

In *Stimmel*, the United States Court of Appeals for the Sixth Circuit analyzed a constitutional challenge to the Lautenberg Amendment under a two-part inquiry, considering whether the challenged statute burdens a Second Amendment guarantee, and if so, whether the statute satisfies "the appropriate level of heightened means-end scrutiny." *Id.* at 204 (citations omitted). The court assumed, without deciding, that "a domestic violence misdemeanant's Second Amendment rights remain intact to some degree." *Id.* at 206 (citations omitted). Turning next to the level of scrutiny, the Sixth Circuit applied intermediate scrutiny, requiring the Government to advance a "significant, substantial, or important" objective that "reasonabl[y] fit" between the challenged statute and the objective. *Id.* at 207 (citations omitted). The court ultimately held "it is reasonable to conclude that domestic abusers have high recidivism rates, pose a continued risk to their families, as well as law enforcement, are more likely to kill their victims when armed, and should be disarmed[,]" and in accordance with "the unanimous view of those circuits that have addressed the question" concluded the "fit" is "reasonable" and Section 922(g)(9) survives intermediate scrutiny. *Id.* at 211; *see also United States v. Chovan*, 735 F.3d 1129, 1139 (9th Cir. 2013), *cert. denied*, 574 U.S. 878 (2014); *United States v. Booker*, 644 F.3d 12, 22–26 (1st Cir. 2011), *cert. denied*, 565 U.S. 1204 (2012); *United States v. Skoien*, 614 F.3d 638, 639–45 (7th Cir. 2010) (en banc), *cert. denied*, 562 U.S. 1303 (2011); *cf. United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010) (holding the statute "presumptively lawful").

We find nothing in the Supreme Court's decision in *Heller* or in the decisions by other federal circuits that would cause us to adopt a strict scrutiny framework for reviewing Appellant's challenge to the Lautenberg Amendment or to overrule this court's decision in *Smith*. Accordingly, we reject Appellant's as-applied challenges to both Charge I and Charge IV, and we find no constitutional infirmity with either conviction.

### E. Denial of Motion for Mistrial

During the Government's findings case and following testimony by LM, who was one of DS's friends, Appellant made a motion to strike LM's testimony or, in the alternative, that the military judge declare a mistrial. The military judge granted Appellant's motion to strike the testimony of LM and denied the motion for a mistrial. Appellant contends the military judge abused his discretion by denying the motion for mistrial based on the "unique circumstances" of this case. Appellant points to the high risk of spillover from the non-domestic

violence offenses and that the military judge ordered the testimony of LM "stricken from the record."[20] Appellant asserts that this combination of factors was so prejudicial to Appellant that it could not be cured by an instruction to the court-members. We disagree.

### 1. Additional Background

Appellant first made a motion for mistrial during DS's testimony after DS made mention of Appellant's prior conviction for domestic violence. During her testimony during the Government's case-in-chief, DS stated that one of the detectives told her about Appellant's prior misdemeanor conviction for domestic violence in Arkansas and DS added Appellant "does have that previous conviction." The military judge sustained in part an objection by the trial defense counsel and then provided a limiting instruction to the court members advising them that they could only consider that information as to the effect it had on DS hearing that information and not as to whether the information was true. A short time later, the military judge sustained another objection by trial defense counsel after DS testified that Appellant was "no longer allowed to be at his job and around guns and everything." The military judge provided another limiting instruction to the court members that they could only consider that information as to the effect that it had on DS to decide to move out of the family home.

DS further testified that she moved in with friends the day after receiving the phone call from law enforcement because they were planning to bring Appellant in for questioning and were concerned for her safety at home. The military judge then took a break in the proceedings. Trial defense counsel requested an Article 39(a), UCMJ, session during which the Defense then requested a mistrial based on the failure to sever the domestic assault offenses involving DS from the other offenses (Charges I, II, and IV), and DS's testimony referencing uncharged misconduct and Appellant's prior conviction. Trial defense counsel stated the basis for the motion for a mistrial was the testimony of DS referencing three incidents prior to the charged timeframe. Trial defense counsel also stated he was renewing his motion to sever the domestic violence offenses from the other offenses, arguing that Appellant could not receive a fair trial under the circumstances. After hearing the argument of counsel for both sides, the military judge denied the defense motion for a mistrial, stating,

---

[20] The military judge instructed the court members to "wholly, completely, and without exception disregard the entirety of [LM's] testimony, and it must have no bearing, whatsoever, on [their] deliberations."

> Under [R.C.M.] 915, mistrial is required when such action is manifest and necessary in the interest of justice because of the circumstances arising during the proceedings which casts [sic] substantial doubt upon the fairness of the proceedings. . . . I have inquired into the views of the parties as required by [R.C.M.] 915(b); and, based on 915(a), as well as the [D]iscussion section, which enjoins military judges to exercise this power with great caution, under urgent circumstances only and for plain and obvious reasons. Taking into account that this is not the kind of information or material that is so prejudicial that a curative instruction would be inadequate, I don't find that a mistrial would be appropriate in these proceedings.

The denial of the motion for mistrial discussed above is not the one challenged by Appellant on appeal. Later, during the testimony of LM, trial defense counsel moved for a mistrial in the alternative to a motion to strike the testimony of LM. It is the denial of the second motion for a mistrial that Appellant raises as error on appeal.

The motion to strike the testimony of LM originated from a discovery issue raised by trial defense counsel before the court-martial. Prior to trial, the military judge denied a defense motion to compel discovery or abate the proceedings as a result of the Government's loss of discoverable material. Specifically, the pretrial interview of LM by SF investigators, as well as those of other witnesses, was recorded but the recording was not saved. According to the military judge's findings of fact, while the investigators routinely saved the recordings of any subject interview, the preservation of witness interview recordings was discretionary on the part of investigators under the local "internal recording policy." Seven witness-interview recordings were not saved in this case. When the recording of a witness interview was not saved, investigators captured the substance of a witness interview in writing on a witness interview form. LM's witness statement, as well as those of other witnesses in this case, were preserved in this way. The military judge denied the defense motion to compel discovery or abate the proceedings after determining that the Defense (1) was "able to obtain comparable evidence" through other reasonably available means; (2) failed to demonstrate the exculpatory value was apparent before the destruction; and (3) failed to demonstrate bad faith by the Government. The military judge acknowledged the destroyed recordings would have provided additional information but concluded that it was entirely speculative that the additional information would be of central importance to an issue as to be essential to a fair trial.

Later, after DS testified, but prior to LM being called to testify, trial defense counsel requested an Article 39(a), UCMJ, session to discuss LM's expected testimony. Acknowledging that the issue was not ripe until LM testified, trial defense counsel provided notice to the court as to concerns regarding the application of the Jencks Act[21] with respect to the destroyed recording of LM's interview with investigators. LM was then called as a witness and testified. She described prior statements by DS that were mostly consistent with DS's testimony regarding the assault in December 2015. LM became emotional at times during her testimony. She also stated that DS did not want to tell anyone else about the assaults. LM additionally testified that when she and PM helped Appellant and his family move, they helped them move a gun safe that she believed contained guns. After trial counsel completed the direct examination of LM, trial defense counsel requested an Article 39(a), UCMJ, session.

LM then testified during the Article 39(a) session about her interview with Detective DL in October 2017. While she could not remember specific details, she estimated that she was at the SF investigations office for one to two hours for her interview. She confirmed that she wrote a statement that was approximately half of a page that only captured the "meat and potatoes," as opposed to the more detailed statement she had given verbally to Detective DL. She had difficulty recalling the details of what she discussed during her interview with Detective DL.

After LM's Article 39(a) session testimony concluded, trial defense counsel asked the military judge to strike LM's prior testimony that she had given on the merits. The military judge asked trial defense counsel whether he wanted LM's testimony struck or if he was requesting a mistrial. Trial defense counsel stated he was requesting LM's testimony be struck. The military judge then again asked whether trial defense counsel was requesting a mistrial. Trial defense counsel said that he was requesting a mistrial in the alternative to LM's testimony being struck. After hearing arguments from counsel for both sides, the military judge took a break, during which he considered the arguments presented, reviewed the evidence and "voluminous materials" that had been provided during the course of the court-martial to that point, and reviewed the applicable case law. The military judge concluded that R.C.M. 914 and the Jencks Act had been violated and that the good-faith loss exception argued by the Government did not apply. The military judge then discussed his conclusions regarding the options available to him—to either strike LM's testimony or grant a mistrial.

---

[21] 18 U.S.C. § 3500.

The military judge then granted the defense request to strike LM's testimony and denied the motion for mistrial. The military judge explained his rationale on the record. He noted that the corroborating evidence provided by LM was not the only available evidence. He noted that the court members had demonstrated that they could follow his instructions as he had previously instructed them to disregard other information in the court-martial. The military judge stated that he considered the fact that LM became somewhat emotional at times during her testimony. He also noted that LM's testimony was not the kind of information that was "so salacious or distracting" that the members would not be able to disregard.

The military judge then provided the following instruction to the court members regarding LM's testimony:

> Members, I have an instruction for you. As with all my instructions, I'd ask you to pay close attention to what I'm about to read to you; and, then, I'm going to have some individualized questions for each of you.
>
> Members, based on legal issues that were raised to my attention yesterday, following the direct examination of Mrs. [LM], the court has determined that the Rules for Courts-Martial do not permit you to consider her testimony. Accordingly, you are instructed to wholly, completely, and without exception disregard the entirety of her testimony, and it must have no bearing, whatsoever, on your deliberations in this case. It is as if it were never given and you will draw no inference favorable or unfavorable to either side based on this order. I specifically note you were not afforded the opportunity to observe her cross-examination from the defense, or the chance to pose her questions yourselves and have thereby not been provided a full account of what her testimony might have been once it was subjected to challenge. As a consequence of that, you have similarly not been provided sufficient information to determine her credibility. Nonetheless, because the court has determined her testimony during direct examination is inadmissible, any additional questioning by the defense or the court members, or me derived therefrom would be similarly inadmissible. For that reason, it will not be developed. Can every member follow this instruction?

In response to questioning by the military judge, each court member individually affirmed he or she could follow the military judge's instruction. The military judge also noted that each court member either lined out material or folded up paper and provided it to the bailiff to shred after he instructed them to destroy any notes they had taken regarding LM's testimony. The military

judge again provided the above-quoted instruction to disregard LM's testimony in its entirety during findings instructions.

### 2. Law

We review a military judge's ruling on a motion for mistrial for a clear abuse of discretion. *United States v. Coleman*, 72 M.J. 184, 186 (C.A.A.F. 2013) (citing *United States v. Ashby*, 68 M.J. 108, 122 (C.A.A.F. 2009)). "The military judge may, as a matter of discretion, declare a mistrial when such action is manifestly necessary in the interest of justice because of circumstances arising during the proceeding which casts substantial doubt upon the fairness of the proceedings." R.C.M. 915(a). "Declaration of a mistrial is a drastic remedy, and such relief will be granted only to prevent a manifest injustice against the accused." *United States v. Rushatz*, 31 M.J. 450, 456 (C.M.A. 1990) (citation omitted). "Because of the extraordinary nature of a mistrial, military judges should explore the option of taking other remedial action, such as giving curative instructions." *Ashby*, 68 M.J. at 122 (citations omitted). A mistrial should only be granted "when 'inadmissible matters so prejudicial that a curative instruction would be inadequate are brought to the attention of the members.'" *United States v. McFadden*, 74 M.J. 87, 89–90 (C.A.A.F. 2015) (quoting *United States v. Diaz*, 59 M.J. 79, 92 (C.A.A.F. 2003)).

### 3. Analysis

We find the military judge did not abuse his discretion by denying the motion for a mistrial. Declaration of a mistrial is a drastic and disfavored remedy, and is not appropriate when curative instructions are adequate. *See McFadden*, 74 M.J. at 89–90 (citations omitted). In this case, the military judge not only sustained timely objections to inadmissible testimony, but also gave strong and specific instructions describing how, if at all, the court members could properly consider the evidence before them.

We addressed Appellant's contention regarding the risk of impermissible spillover in the discussion of the motion to sever above. The military judge granted the relief requested by the trial defense counsel by striking LM's testimony. We are not persuaded by Appellant's attempt to combine these two contentions to form "unique circumstances" warranting a mistrial. The effect of the military judge's ruling with respect to LM's testimony prevented the testimony of at least three additional government witnesses, which certainly did not work to the prejudice of Appellant. Other witnesses, JL and AS, also described prior consistent statements of domestic abuse by DS, similar to the testimony provided by LM. As the military judge noted, while LM's testimony was sometimes emotional, it was not to such a degree that the court members would not be able to disregard it. Each of the military judge's rulings were fully

supported by the evidence in the record and reflected the correct application of the law.

We presume the court members followed the military judge's instructions absent evidence to the contrary. *See United States v. Stewart*, 71 M.J. 38, 42 (C.A.A.F. 2012) (citing *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000)). We conclude the military judge did not clearly abuse his discretion in finding the favored remedy of curative instructions was adequate, and concluding that the disfavored remedy of mistrial was not "manifestly necessary in the interest of justice." *See* R.C.M. 915(a); *Coleman*, 72 M.J. at 186 (citation omitted).

## F. Timeliness of Appellate Review

### 1. Additional Background

Appellant's case was originally docketed with this court on 30 January 2019. The delay in rendering this decision within 18 months of docketing is presumptively unreasonable. However, we determine there has been no violation of Appellant's right to due process and a speedy post-trial review and appeal.

### 2. Law

"We review de novo claims that an appellant has been denied the due process right to a speedy post-trial review and appeal." *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). In *Moreno*, the United States Court of Appeals for the Armed Forces (CAAF) established a presumption of facially unreasonable delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. *Id.* at 142. Where there is such a delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "No single factor is required for a finding of a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533.

However, where an appellant has not shown prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In *Moreno*, the CAAF identified three types of cognizable prejudice arising from post-trial processing delay: (1) oppressive incarceration; (2) anxiety and concern; and (3)

impairment of ability to present a defense at a rehearing. 63 M.J. at 138–39 (citations omitted).

### 3. Analysis

The court is affirming the findings and sentence in this case. We find no oppressive incarceration because Appellant is no longer in confinement and his appeal has not resulted in a finding warranting sentencing relief. As for anxiety and concern, the CAAF has explained that "the appropriate test for the military justice system is to require an appellant to show particularized anxiety or concern that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision." *Id.* at 140. Appellant has made no claim of such particularized anxiety, and we discern none in his case. Lastly, where the appeal does not result in a rehearing on findings or sentence, as in this case, an appellant's ability to present a defense at a rehearing is not impaired. *Id.* Because we conclude that Appellant suffered no prejudice from the delay, we do not address the first three *Barker* factors.

Where, as here, there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *Toohey*, 63 M.J. at 362. This is a lengthy and complicated case. The record of trial includes 10 volumes. The proceedings took place over eight days, and the transcript is almost 2,000 pages long. Appellant filed his brief with this court almost seven months after docketing, the Government filed its brief more than two months later, and Appellant then filed a reply brief a month later. Appellant raised significant issues for our consideration, including those about which we heard oral argument. We originally granted Appellant's motion for oral argument on 8 January 2020 and the oral argument was scheduled for 24 April 2020. However, due to the imposition of federal COVID-19 social distancing guidelines and travel restrictions—all in response to a global pandemic—the oral argument was delayed with Appellant's consent until 21 July 2020.

On 6 July 2021, counsel for Appellant submitted a motion for leave to file a notice of Appellant's demand for speedy appellate processing. We denied Appellant's motion, but nevertheless recognized Appellant's demand for speedy appellate review. The delay in issuing the court's opinion exceeded the 18-month *Moreno* standard by approximately 12 months. Under the particular circumstances in this case, we do not find the delay so egregious as to adversely affect the perceived fairness and integrity of the military justice system. *See Toohey*, 63 M.J. at 362.

Recognizing our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we have also considered whether relief for excessive post-trial delay is appropriate even in the absence of a due process violation. *See United States v. Tardif*, 57

M.J. 219, 225 (C.A.A.F. 2002). After considering the factors enumerated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we conclude it is not.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred.[22] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

NATALIA A. ESCOBAR, Capt, USAF
Deputy Clerk of the Court

---

[22] Our review of the record reveals the convening authority ordered no portion of Appellant's sentence executed in the initial court-martial order. The term of confinement already having been served, we note that if the other elements of the sentence are not ordered executed in the final court-martial order, any reduction in grade and forfeiture of pay and allowances imposed upon Appellant pursuant to the adjudged sentence must be restored to Appellant. *See United States v. Bridges*, 65 M.J. 531, 534–35 (C.G. Ct. Crim. App. 2007), *aff'd*, 66 M.J. 246 (C.A.A.F. 2008).